ESTATE OF BARNEY F. WIGGINS, DECEASED, BONNIE MAUD WIGGINS, ADMINISTRATRIX AND SUBSTITUTE TRUSTEE, AND BONNIE MAUD WIGGINS, INDIVIDUALLY, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7421-74.    Filed July 30, 1979.

*Robert I. White* and *Lawrence Jones,* for the petitioners.
*Bernard B. Nelson,* for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1963 | $14,683.44 | 1966 | $71,399.37 |
| 1964 | 27,082.61 | 1967 | 44,465.66 |
| 1965 | 84,128.94 | | |

The issues presented to us for our resolution are the following:

(1) Whether petitioners may report the gain on the sale of subdivision lots under the cost recovery method of accounting.

(a) Whether contracts for deed received as partial consideration for the sale of subdivision lots have an ascertainable fair market value as of the date of the transactions.

(2) Even if the contracts for deed have an ascertainable fair market value, whether petitioners are entitled to use the cost recovery method because the contracts for deed are not the equivalent of cash or because the collectibility of the installments due under the contracts is speculative and contingent.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the attached exhibits, are incorporated herein by reference.

Bonnie Maud Wiggins, a petitioner herein, and Barney F. Wiggins (hereinafter referred to as Wiggins), were husband and wife during the taxable years at issue. Mrs. Wiggins is the administratrix and substitute trustee of the Estate of Barney F. Wiggins, who died on November 19, 1970. Mrs. Wiggins resided in Livingston, Tex., at the time the petition herein was filed.[2] The Wigginses filed joint Federal income tax returns for the taxable years 1963 through 1967.

Sometime during 1963, Wiggins and T. W. Elliott formed a partnership for the purpose of buying, subdividing, and selling real estate lots in Sam Houston Lake Estates, a subdivision

---

[1]Decision will be entered under Rule 155, Tax Court Rules of Practice and Procedure, if respondent prevails because petitioners have elected to report the gain under sec. 453, I.R.C. 1954, in that event.

[2]Although Mrs. Wiggins is a petitioner herein in both individual and representative capacities, her involvement during the taxable years at issue is due primarily to the fact that the returns filed for those years were joint returns. Mrs. Wiggins will be referred to herein as petitioner.

located approximately 60 miles northeast of Houston. Wiggins owned a 50-percent interest in the profits and losses of this partnership until its termination on October 2, 1964.

Sam Houston Lake Estates consisted of approximately 837 acres in a rectangular tract about one-half mile by 2 miles. The acreage was acquired in four transactions. On February 20, 1963, a 464-acre tract was acquired from Price Daniel for $38,300 paid with $5,300 cash and a note for $33,000 secured by a vendor's lien on the property.[3] On May 8, 1963, 135.08 acres were acquired by an exchange of unspecified property plus a small cash consideration. On November 3, 1963, another 50 acres were purchased. On February 27, 1965, 188.01 acres were acquired for $30,000. The purchase price had been borrowed by the Wigginses from the Citizens State Bank of Corrigan and was evidenced by a promissory note secured by a deed of trust on the property.

Elliott sold his partnership interest to Wiggins on October 2, 1964, for a $72,000 promissory note secured by a deed of trust on Sam Houston Lake Estates property. On March 24, 1966, both the note and the deed of trust were assigned by Elliott to C. L. Cochran.

During the taxable years at issue, the Sam Houston Lake Estates property was encumbered by the liens set forth above.

The 837 acres upon which Sam Houston Lake Estates was developed fronted on the east side of Trinity River. The tract contains three lakes stocked with white perch, bass, and catfish. The land was low and swampy with poor drainage. It was crisscrossed with creeks and thickly covered with trees, vines, and underbrush. The area also was populated with various wild animals. In 1963, a 2-mile road running generally east to west was bulldozed through the tract. Later, short north-south roads were installed. The main road essentially was an unimproved, dirt road which became very difficult to travel upon in wet weather. At some time, iron ore was placed on the road which improved it somewhat. The roads did not have curbs, gutters, or sidewalks. Although electricity was available very soon after the development began, there were no street lights. Central sewage collection was not provided nor was garbage collection. Lot purchasers provided chemical toilets or septic tanks and disposed

---

[3]Price Daniel assigned the note and vendor's lien to the First Liberty National Bank on Oct. 21, 1963.

of their own garbage. Water was supplied from several wells drilled in the subdivision and carried to individual lots by 1-inch plastic pipe. Fire protection was provided by the fire department in Cleveland, 20 miles from the subdivision. Police protection was provided by the county sheriff.

Sales in the subdivision began as soon as the first road was started. Since no survey had been made, the lots sold were marked in some manner (red flagged) and identified by metes and bounds description. Sam Houston Lake Estates eventually was subdivided into 22 sections containing approximately 2,800 lots. The lots averaged 50 x 125 feet and were priced at $199, $595, and $995 per lot. The price of the lots depended upon whether or not they were waterfront lots.

When a sale was agreed upon, a downpayment was made and an instrument referred to as a contract for deed was executed by the parties. The contract for deed was a form in triplicate which was used throughout the taxable years at issue. The contract for deed stated in relevant portion:

THE STATE OF TEXAS
COUNTY OF LIBERTY

This agreement made in triplicate this the ____day of _____, 19__, between Barney Wiggins, party of the first part, Seller, and _____ of (address)_____ jointly and severally, party of the second part, Buyer, WITNESSETH:

That the Seller hereby agrees to sell to the Buyer, and the Buyer agrees to purchase from the Seller the surface estate only in and to all that parcel of land situated in Liberty County, Texas, and described as follows: Block ____Lot ____of Section ____of the Sam Houston Lake Estates Subdivision. Subject to the restrictive covenants, easements and charges stated herein at and for the price of ($____) _____Dollars, of which ($____) _____Dollars have been paid at the time of the signing of this agreement, the receipt of which is hereby acknowledged, and the Buyer agrees to pay balance as follows, viz: ($____) _____Dollars on or before the ____day of _____19__and balance to be paid at $____on or before the ____day of each month thereafter until such principal sum shall be paid in full. Buyer agrees to pay interest at the rate of Seven (7%) per cent per annum from date hereof until paid, on the unpaid amount owing upon said land, and to pay the taxes billed by the state, county and school.

All monies that shall become due and payable under the terms of this agreement shall be paid promptly at the Citizens State Bank, Corrigan, Texas, or such other place as may be designated by the Seller, his heirs, executors or assigns. No payments shall be made to any agent unless authorized in writing by the Seller. Upon payment in full of the purchase price and interest as aforesaid and the pro-rata adjustment of taxes, and other public dues or charges, estimated on the parcel of land hereby sold, adjusted to the date of

this Agreement, the Seller agrees to give a good and sufficient warranty deed, subject to and with the benefit of all easements, rights of way and stipulations as may appear of record and be applicable, and restrictions herein contained.

If Buyer desires a title policy, it may be obtained at the Buyer's expense, and Seller will arrange for same at Buyer's request.

It is mutually understood and agreed that should the Buyer default in any of the terms or provisions of this Agreement, the Seller may at his option declare this Agreement breached and retain as fixed, ascertained and liquidated damages, or as compensation for the damages and expenses he has been put to, including the use of said lot, and not as a penalty, any and all sums of money paid hereunder by the Buyer, whereupon all right, title and interest of the Buyer in and to the lot hereinabove described shall forthwith cease.

This Agreement is not assignable without the written consent of the Seller, and it is further agreed and understood that no representations made by any agent or employee of the Seller not reduced to writing and incorporated herein shall be binding upon the Seller, and no modification or waiver of any of the terms of this agreement shall be of any force or effect unless set forth in writing and signed by the parties hereto, specifically referring to this Agreement.

The deed to be given under this contract shall contain the following restrictive covenants, easements, reservations, charges and conditions, which are a part of a general development scheme of the land referred to in this agreement and shall run with and bind the land to be conveyed hereunder.

The downpayments were usually 5 percent of the sales price of the lot and the monthly payments were usually $1 for each $100 of the price of the lot.

No credit checks were ever made by Wiggins to determine a prospective lot purchaser's credit status or ability to pay the purchase price of the lot. And no effort was made to determine whether the person acquiring the lot actually was the person he had identified himself as being.

It was Wiggins' policy that any purchaser could swap his lot for another lot of equal or higher price at any time. A purchaser so doing would receive credit toward the purchase price on the new lot for all principal payments on the old lot. If a swap was made, the original contract for deed was amended to reflect the change or a new contract for deed was executed. Of the lots sold during the taxable years at issue, 94 eventually were swapped.

If a purchaser wanted to transfer his interest in the lot to another he could do so upon Wiggins' approval. Of the lots sold during the taxable years at issue, 269 were transferred to persons other than the original purchasers.

It was also Wiggins' policy to give a purchaser a credit toward the principal due on his lot equal to 5 percent of the cost of lots

purchased by persons whom the purchaser had advised to visit Sam Houston Lake Estates. All lot purchasers were so advised by the salesmen.

If a lot purchaser failed to make the monthly payments, the contract for deed was voided, and the lot was placed back in inventory for sale. Wiggins' policy was not to attempt to enforce contracts for deeds for nonpayment. Occasionally, the same lot was inadvertently sold to two purchasers without either having knowledge of the other sale.

The number of sales, total sales, downpayments, and collections on sales in year of sale are as follows:

| Year of sale | Number of sales | Downpayment plus amount due on contract | Downpayments | Collections in year of sale[4] |
|---|---|---|---|---|
| 1963 | 127 | $117,883.26 | $10,791.87 | $9,236.03 |
| 1/1/64 to 10/2/64 | 186 | 190,990.19 | 15,233.73 | 15,235.61 |
| 10/3/64 to 12/31/64 | 24 | 25,676.50 | 1,211.75 | 100.54 |
| 1965 | 355 | 322,380.71 | 24,591.99 | 30,483.52 |
| 1966 | 314 | 271,191.56 | 16,217.90 | 16,251.08 |
| 1967 | 231 | 195,872.40 | 9,053.80 | 11,755.30 |
| | 1,237 | 1,123,994.62 | 77,101.04 | 83,062.08 |

Collections were made in years subsequent to the year of sale as follows:[5]

| | 1/1/64 to 10/2/64 | 10/3/64 to 12/31/64 | 1965 | 1966 | 1967 | Total |
|---|---|---|---|---|---|---|
| Sales in 1963 | $6,963.49 | $1,720.10 | $9,380.83 | $6,358.65 | $7,417.70 | $31,840.77 |
| Sales from 1/1/64 to 10/2/64 | | 3,211.18 | 13,781.63 | 16,032.80 | 12,357.96 | 45,383.57 |
| Sales from 10/3/64 to 12/31/64 | | | 1,463.84 | 1,282.20 | 2,223.80 | 4,969.84 |
| Sales in 1965 | | | | 25,412.97 | 19,140.91 | 44,553.88 |
| Sales in 1966 | | | | | 20,536.01 | 20,536.01 |

Of the 1,237 contracts for deed executed during the taxable years at issue, 496 were voided for lack of payment.

On the joint income tax returns filed by the Wigginses for the taxable years 1964 through 1967, no gain on the sale of lots in Sam Houston Lake Estates was reported until after the cash payments, excluding interest payments, on a lot sale exceeded

---

[4]The amount collected does not include interest.

[5]The amounts collected do not include amounts received as interest.

the adjusted basis of the lot. After the adjusted basis of each lot was recovered, cash collections, excluding interest, were reported as ordinary income during the taxable years 1964 through 1967. The cost recovery method used on the joint income tax returns also was used on the returns for the partnership and, the pro rata share of gains and losses determined under this method was reported on the Wigginses' joint income tax returns for the taxable years 1963 and 1964.[6]

The notice of deficiency determined that contracts for deed received on each of the Sam Houston Lake Estates lot sales during the taxable years at issue constituted transferable property received from completed sales and that the gross income from such sales should have been computed by adding to the downpayment received the fair market value of such contracts as set forth in the notice of deficiency. The fair market value was computed by discounting by 40 percent the unpaid balance as of December 31 on all of the contracts for deed executed during the particular taxable year.

The market for contracts for deed is comprised of individuals or groups of private investors. Neither banks nor savings and loan associations nor mortgage companies will purchase contracts for deed or accept a contract for deed as collateral for a loan. The potential purchasers would be interested in the contracts as investments only if they could acquire a substantial number of them and only if they could be assured of title to the property subject to the contracts free of prior liens and encumbrances. There was virtually no market for the contracts for deed absent satisfaction of these conditions. And while it would not have been impossible to find a buyer for each contract for deed as it was executed, it would have been very difficult to do so even if Wiggins also conveyed title to the underlying land because of the prior liens, the right to swap lots, and the credits allowed for introducing prospective purchasers, as well as the absence of a payment record.

## OPINION

The issues presented in this case concern the proper method of

---

[6]On the joint income tax returns for 1963–67 and also on the partnership returns for 1963 and 1964, an incorrect adjusted basis for certain lots was used. The correct adjusted basis for each lot is shown in the exhibits attached to the statutory notice of deficiency.

accounting for the gain realized upon the sales of lots in Sam Houston Lake Estates during the taxable years at issue. The controversy is engendered by the receipt of the contracts for deed as part of the purchase price of the lots and it involves the basic concept of amount realized as defined in section 1001(b), I.R.C. 1954.[7] The parties are in disagreement about the phrase "fair market value" as it relates to the contracts for deed and in particular on how it is determined, when it is determined, and whether it is determinable at all, given the circumstances of this case.

Section 1002 provides that "Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized." Section 1001(a) provides that gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis for determining gain under section 1011. Section 1001(b) provides that the amount realized from the sale of property shall be the sum of any money received "plus the fair market value of the property (other than money) received."

Fair market value has been defined as the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances. *McShain v. Commissioner*, 71 T.C. 998 (1979). Only in rare and extraordinary circumstances will property be considered not to have an ascertainable fair market value. Sec. 1.1001–1(a), Income Tax Regs. Whether property has an ascertainable fair market value and the amount of such value are questions of fact. In the event that fair market value of property received cannot be determined, the transaction remains open for Federal income tax purposes and the taxpayer is entitled to report his gain under the cost recovery method. Under this method of accounting, the payments received are applied first toward recovery of basis and then as taxable gain. *Burnet v. Logan*, 283 U.S. 404 (1931); *McShain v. Commissioner, supra.*

Petitioner's position is that she should be allowed to use the

---

[7]Sec. 1001(b) provides in relevant portion that:

The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue, unless otherwise specified.

cost recovery method of reporting income on the sale of these lots because, at the time the contracts of deed were received, the lots had no ascertainable fair market value, or alternatively, that they were not the equivalent of cash and she is entitled to use the cost recovery method as a matter of law under this Court's decision in *Warren Jones Co. v. Commissioner*, 60 T.C. 663 (1973), revd. 524 F.2d 788 (9th Cir. 1975). Petitioner further contends that even if the contracts did have a fair market value, she is entitled to use the cost recovery method of reporting the installment payments because collections under the contracts were doubtful or highly speculative.

Respondent, on the other hand, believes that valuation of the contracts for deed is possible and, therefore, the gain must be reported in full in the taxable year of the transactions, unless petitioners elect to report the gain under the installment method of section 453.[8]

Petitioner emphasizes that we are concerned with whether the contracts for deed had an ascertainable market value at the time they were executed under the conditions that then existed, not with the value of the underlying lot and not with the value of a package of the contracts as of the end of the taxable year of sale under different conditions. Petitioner presented the testimony of bankers in the vicinity of the subdivision, one of whom was engaged in similar subdivision developments, bankers from Houston, mortgage loan officers, real estate appraisers, and other financial people from the area, all of whom testified that contracts for deed alone, subject to the conditions existing with respect to these particular contracts, had no fair market value and there was no market for them. The conditions referred to were that the underlying property was not fee property and had prior liens attached, there had been no credit checks on purchasers and the downpayments and monthly payments were low, and that there were provisions for swapping lots and finder's fees, etc. Some of these witnesses did indicate that if all of the detrimental conditions were removed, and the contracts were offered with deeds to the underlying lots, free and clear of all encumbrances, attached, they might be sold to private speculative investors. However, even then a guarantee from the

---

[8]Respondent has conceded that petitioners are entitled to use the installment method of accounting in the event it is determined that petitioners are not entitled to use the cost recovery method.

developer might be required. They also testified that banks and other financial institutions would neither buy the contracts nor loan money against the contracts. Some of the witnesses also suggested that no one would buy such contracts until they were seasoned.

In support of his determination, respondent offered the testimony and written appraisal report of Jerry S. Dominy, an expert real estate appraiser, who had been requested by Regional Counsel for the Internal Revenue Service to estimate, as of the end of each year, the fair market value of the contracts that had been entered into during the respective years. Dominy was given a list of the contracts, the face values thereof, the payments that had been made on the contracts during the year, and the balances due on the contracts as of December 31 of each of the years here involved.

In preparing the appraisal, Dominy assumed that the contracts for deed were secured by the lots to which they pertained. He also assumed that the contracts for deed would be sold in bulk and therefore appraised the value of all of the contracts for deed executed during a particular taxable year as of the last day of that taxable year. He further assumed that Wiggins would be able to deliver clear title to the lots subject to the contracts for deed free of prior liens either by paying off the prior liens with the amount received upon sale of the contracts or with other funds. In his opinion, based upon these assumptions and his review of what he considered to be comparable subdivisions, the fair market value of the unpaid balance of the contracts for deed as of December 31 of each of the taxable years at issue was 60 cents on the dollar or a discount of 40 percent.[9] We are not certain whether Dominy's appraisal was made before or after the notice of deficiency was prepared but Dominy's valuation of the contracts coincides with the values used by respondent in the notice of deficiency. From this we presume that respondent's valuation was based on the same assumptions used by Dominy. On the witness stand, Dominy agreed that there was no market for either the contracts for deed alone or the contracts with

---

[9]Dominy was unaware of the ability to swap lots and therefore did not consider that factor in preparing his appraisal.

Wilbur L. White, a real estate appraiser, testified that if the assumptions made by Dominy in his report are made, that the contracts could be sold for 35 to 40 percent of the outstanding balance as of the date of the transaction.

deeds attached unless the title to the underlying lot was free of liens and encumbrances.

As we see it, our first concern is whether the contracts for deed had an ascertainable market value as of the date of the transaction. As petitioners point out, the consideration received in a sale should be valued as of the date of the particular transaction. Respondent concedes the accuracy of this premise. However, he argues that valuing the contracts in bulk as of the last day of the taxable year was required by practical considerations and that in any event the valuation date utilized here would have no meaningful importance insofar as the actual figure is concerned. But there can be little question that the value of a contractual promise to pay will increase during the first year because of the establishment of a payment record. If the unpaid balances of all the contractual promises received during a particular year are lumped together at the end of a year and a discount factor applied to the unpaid balances as of that date, the relation back of that amount to the dates the transactions occurred on a pro rata basis is not to our mind an accurate method of valuation of the individual contracts. In fact, it suggests that there is no accurate means of ascertaining the fair market value of the individual contracts.[10] Undoubtedly on the record before us, the only realistic market for the contracts for deed would be that of a private investor or group of investors purchasing a substantial number of the contracts or the entire subdivision after some period of time had elapsed from the dates of sale. However, as petitioners contend, the value to be determined here is that of the consideration received by Wiggins for the sale of each lot at the time the sale occurred. Naturally, the value of a substantial number of these contracts will be higher than the value of one of them. But we are not trying to determine whether a package of these contracts had an ascertainable fair market value. Petitioners are entitled to treat each separate transaction as exactly that and report the gain or loss on each transaction separately.

Dominy's use of so-called comparables to determine the amount of discount that should be applied to these contracts casts further doubt on the weight that can be given to his

---

[10]It is our impression that Dominy was not specifically asked by respondent whether the contracts had an ascertainable fair market value, but only to determine as best he could what the fair market value was. *McShain v. Commissioner*, 71 T.C. 998, 1009 n. 4 (1979).

testimony in solving the particular problem we have here. Dominy's comparables were transactions in which entire subdivision enterprises, including the land, contracts, improvements, obligations, and liabilities, were sold some time after the subdivisions had been opened. Furthermore, many of these sales took place between 1970 and 1973, some years after the years here involved. The purchase of an entire subdivision seems to us to be quite different from the purchase of a single contract for deed or in fact a package of contracts for deed.

Also underpinning respondent's valuation method are the assumptions that Wiggins could and would transfer clear title to the land subject to the contract for deed free of prior liens and encumbrances. Petitioners argue that this approach establishes a market where one otherwise would not exist. The realities surrounding the transferability of the contracts for deed were such that virtually no one would buy a contract without satisfaction of these conditions. Obviously, if we must assume completion of certain preliminary events before a prospective purchaser will contemplate acquisition of a particular item in order to establish a fair market value, the question again arises as to how accurate that valuation process is. If, as the evidence indicates, the marketability of a contract for deed essentially is nil without the concomitant transfer of title and satisfaction of prior liens, should this Court in order to find a value, set up the market structure in which a value will result? We think not.

Our conclusion that the valuation method relied upon by respondent is not apt for the problem before us and is not accurate gives rise to a serious question of whether the presumption of correctness which usually attaches to respondent's determination continues to apply. *United States v. Hover*, 268 F.2d 657, 665 (9th Cir. 1959); *Russell v. Commissioner*, 45 F.2d 100, 103 (1st Cir. 1930). But even so, the burden of proving that the contracts for deed had no ascertainable fair market value remains with petitioners. *United Aniline Co. v. Commissioner*, 316 F.2d 701 (1st Cir. 1963). Therefore, we must decide whether the evidence presented by petitioner establishes that each contract for deed did not have an ascertainable fair market value on the date of each transaction. That petitioners have done so is apparent from the record.

There can be little question that a contract for deed alone had virtually no marketability as of the date it was executed. No

payment record on the contract had been established and no effort was made to check the credit records of the lot purchasers. Moreover, a lot purchaser could reduce the outstanding balance on the contract by the amount of sales commission on any lot sold to a person whom he had directed to Sam Houston Lake Estates. And a purchaser could at any time terminate his interest in a particular lot and transfer the amount already paid to another lot of equal or higher price. In such event, the original contract either was voided and a new contract executed or the alteration was made on the original contract. Therefore, the probability of completion of a particular contract or the receipt of the balance due in cash was not by any means a foregone conclusion on the date of the transaction. And while, in a sense, the underlying lot may be considered security for the contract, that fact did not insure that the contract would be performed by the buyer. It simply assured the seller that he would not lose both the lot and the purchase price.

Fair market value envisions a willing seller as well as a willing buyer. Respondent has not suggested why Wiggins or any other owner of the business would be willing or able to transfer title to underlying lots free and clear of all encumbrances to a prospective purchaser who would be willing to pay only 60 percent or less of the unpaid face value of a package of the contracts of sale. The business was deliberately conducted on the existing basis and we see little reason why the owner would accept much less than 100 percent of the face value of the contracts. We doubt there would be a meeting of the minds or a sale.

Furthermore, the testimony of witnesses for both parties establishes that a single contract for deed could not have been assigned for value as of the date of the transaction. Respondent's assertion that we may infer from the fact that the lots were being sold that the contracts for deed have value is correct as far as it goes. See *United States v. Davis*, 370 U.S. 65 (1962); *Philadelphia Park Amusement Co. v. United States*, 130 Ct. Cl. 166, 126 F. Supp. 184 (1954). However, we are not holding that the contracts were valueless; we simply conclude that it was impossible to determine with fair certainty the market value of

the contracts for deed as of the date of sale under the traditional definition of fair market value.[11]

In *Warren Jones Co. v. Commissioner, supra,* both this Court and the Court of Appeals found that the contract had a market and an ascertainable fair market value. This Court concluded, however, that because of the large discount involved the contract was not the equivalent of cash and therefore the taxpayer was entitled to report gain on the cost recovery method. The circuit court reversed, holding that if the fair market value of the contract was ascertainable, that value had to be included in the amount realized in the year the transaction was closed. Since we have concluded here that the contracts for deed had no readily ascertainable fair market value we need not deal with, and we express no opinion regarding, the issues presented in *Warren Jones.* See *McShain v. Commissioner, supra.*

Petitioners do raise a point, however, which we believe merits comment although we need not reach it in this case. Petitioners argue that closing the land sale transactions involved in this case for purposes of determining the amount realized on the sale of the lots does not preclude them from reporting the payments received pursuant to the contracts for deed under the cost recovery method if they can establish that the obligations embodied in the contracts for deed are "speculative." *Underhill v. Commissioner,* 45 T.C. 489 (1966).[12] Without deciding the merits of petitioners' argument, an analysis thereof does suggest that the cost recovery method would be the most realistic, practical, reasonable, and appropriate method of accounting for the gains on the sales of these lots whether each transaction is deemed to be open, or whether we pluck a figure out of the air and call it the fair market value of the contract of sale and thus treat it as a closed transaction.

However, our conclusion is that generally these contracts of

---

[11]Our conclusion is bolstered by the accounting morass which will result were we to find an ascertainable fair market value for these contracts for deed. The logistics involved in closing these transactions for income tax purposes to the seller or the buyer is to our mind a factor in deciding whether there would be a willing seller or buyer.

[12]Although the petitioner in *Underhill v. Commissioner,* 45 T.C. 489 (1966), had purchased interest-bearing obligations at a discount from the unpaid principal balance at the time of acquisition, we are not convinced that the factual distinction from this case is of particular importance to this discussion. Once the transaction by which Wiggins acquired the contract for deed is closed (i.e., an amount realized is determined), the issue presented. See W. Neuhauser, "Cost Recovery—A Useful and Sometimes Overlooked Tax Accounting Concept," 20th Ann. U.S.C. Tax Inst. 711, 721–728 (1968).

sale had no ascertainable fair market value at the date they were executed and delivered and hence the transactions are to be considered open, and petitioners are entitled to use the cost recovery method in accounting for these transactions. Respondent's determination to the contrary in the notice of deficiency was erroneous and we decide this issue for petitioners.

*Decisions will be entered under Rule 155.*