JAMIL DIAB and MAHASON DIAB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Diab v. Commissioner
Docket No. 7344-73.
United States Tax Court
T.C. Memo 1979-475; 1979 Tax Ct. Memo LEXIS 49; 39 T.C.M. (CCH) 561; T.C.M. (RIA) 79475; November 29, 1979, Filed *49 Held: (1) Respondent's determination that petitioner understated income sustained; (2) additional deductions for business expenses denied; (3) deductions for charitable contributions disallowed; (4) petitioner entitled to a bad debt deduction; (5) claimed loss of business property disallowed; and (6) section 6653(a) addition to tax imposed. Karl Schelly, for the petitioners. Allan E. Lang and William E. Bogner, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' Federal income taxes: Addition to tax
Year
Deficiency
Sec. 6653(a) [1]
1959
$48,221.09
$ 2,411.06
1960
21,826.09
1,091.31
1961
34,902.20
1,745.11
1962
68,040.40
3,402.02
1963
8,738.52
436.93
1964
591.72
29.59
1965
2,997.45
149.87
1966
4,343.16
217.16
After concessions, the issues remaining for our decision are as follows: 1. Whether petitioners understated their gross income from the sale of approximately 80 parcels of real property during the years 1959 through 1965. 2. Whether petitioners realized interest income from the financing of the real property sales *50 in excess of the interest expense incurred in the financed purchase of such properties for each of the taxable years 1959 through 1963. 3. Whether petitioners are entitled to deduct expenses incident to their real estate transactions in excess of the amounts allowed by respondent. 4. Whether petitioners are entitled to deduct under section 170 claimed charitable contributions for the years 1959 through 1964 and 1966. 5. Whether petitioners are entitled to a bad debt deduction of $300 for 1966. 6. Whether petitioners are entitled to deduct for 1965 a claimed loss on business property in the amount of $20,000. 7.Whether petitioners are liable for the additions to tax under section 6653(a) for 1959 through 1966. FINDINGS OF FACT Some facts were stipulated and are found accordingly. Jamil Diab (hereinafter petitioner) and Mahason Diab, husband and wife, resided in Scottsdale, Arizona, when they filed their petition in this case. From 1948 through 1963, petitioner resided in Chicago, Illinois. After 1963, petitioner's legal residence was in Arizona. During the years in issue, petitioner filed his joint Federal income tax returns with the District Director of Internal Revenue, *51 Chicago, Illinois, reporting on the cash method of accounting. In 1958 petitioner entered the real estate business in Chicago. Thereafter, from 1959 through 1965, petitioner, individually and with others, purchased and sold approximately 80 parcels of improved real property located on the south side of Chicago. More than half of these transactions were under-taken in the name of Trade and Mortgage Company, a Chicago real estate partnership in which petitioner was a partner. Prior to 1965, no U.S. Partnership returns were filed by Trade and Mortgage Company. Petitioner operated as a real estate speculator, purchasing single family residences in neighborhoods whose population was changing from white to predominantly black. Since most of the properties purchased were in poor condition, petitioner would occasionally make repairs before reselling them. To find these properties, petitioner frequently relied on local real estate brokers and often paid them commissions ranging from three to six percent of the selling price. Petitioner financed approximately one-third of these purchases by obtaining mortgage loans from various lending institutions in Chicago. The annual interest rate *52 on those loans was 6 1/2 percent. In several of the transactions, petitioner also paid points, commissions, appraisal fees and other miscellaneous expenses incident to such financing. Petitioner generally sold the properties within a very short period of time following their acquisition. In many instances, petitioner had obtained prospective buyers even before his own funds were committed to a deal. Of the properties sold from 1959 through 1965, 19 were sold for cash and small second mortgage, 37 were sold on real estate contracts and the balance were sold for cash. The real estate contracts called for a minimal cash down payment with monthly installments of the unpaid principal at interest rates of 6 to 7 percent per year. Under the terms of each contract, the purchaser was also required to deposit, along with his monthly payments, 1/12 of the annual insurance premiums and real estate taxes levied on the property. Many of the contracts further provided that when a buyer paid a designated portion of the purchase price, the petitioner would deliver a warranty deed to the premises and take back a second mortgage on the remaining balance under the same terms and conditions as originally *53 stated in the real estate contract. Whether petitioner would take back a second mortgage from a purchaser also depended on his judgment as to the credit worthiness of that particular buyer. During the years in issue, a market for such second mortgages and real estate contracts existed in the Chicago area. On Schedule C of his joint income tax returns for 1959 through 1965, petitioner reported the following amounts as gross profit realized on the real estate transactions involved herein: 1959
$ 11,235.12
1960
11,293.70
1961
16,117.77
1962
20,401.59
1963
16,740.38
1964
12,724.14
1965
9,429.09
Except for 1965, however, those returns did not contain reference to any of the real estate sales or the manner by which petitioner computed his gross profit. Petitioner made no election in those returns to report on the installment method of accounting. In the notice of deficiency, respondent determined that petitioner understated his gross income from the real estate transactions he entered during the years at issue. Respondent also determined that, for 1959 through 1963, petitioner had unreported interest income from the financing of real estate sales in excess of the interest expense incurred in the financed *54 purchase of such properties. During the years 1960 through 1964 and 1966, petitioner made payments to the payees indicated in the following summary of cancelled checks and receipts. 1960
Date
Payee
Amount
11/21/60
Colfax Lodge
$40.00
1961
1/27/61
Colfax Lodge
$40.00
2/12/61
Colfax Lodge #450
40.00
4/10/61
Colfax Lodge
50.00
4/30/61
Colfax Lodge
50.00
6/11/61
Colfax Lodge #450
50.00
7/2/61
Colfax Lodge #450
40.00
8/22/61
Colfax Lodge #450
40.00
1962
2/14/62
Colfax Lodge #450
$ 60.00
12/7/62
Harvard Islamic Society
20.00
4/3/62
Colfax Lodge #450
40.00
3/4/62
Colfax Lodge #450
50.00
3/27/62
Disabled American Veterans
2.00
7/2/62
Cash (donations)
50.00
3/14/62
Al Bayan [2]
100.00
5/24/62
Al Bayan
126.00
2/18/62
Al Bayan
75.00
1/22/62
Husseim Karoub [3]
35.00
5/25/62
Souad Kanj
50.00
1963
12/7/63
Hope School $ 2.00
12/7/63
Tuberculosis Institute
of Chicago
2.00
1964
6/6/64
Al Bayan
$ 30.00
4/30/64
Abdelhadi & Co. for
Publicity
16.85
11/9/64
Mr. Ghazi Al-Hachim [4]
5.90
4/24/64
Islamic Centre
25.00
2/7/64
Islamic Centre
25.00
2/14/64
The Islamic Center
25.00
11/9/64
Iman Hussien Karoub
10.00
1966
1/12/66
Shukin Abdallah Hassan
$ 50.00
1/15/66
Sam Hamed
20.00
1/18/66
Dr. M. T. Mehdi [5]
20.00
1/21/66
Zafar Abdullah [6]
5.00
4/4/66
Zafar Abdullah
11.00
3/11/66
Mr. Muhammad Abdallah
50.00
3/29/66
Mr. Sam Hamood
20.00
10/10/66
Imam Hussien Karoub
25.00
1/15/66
The Geneva Islamic Center
20.00
1/15/66
Chicago Islamic Center
20.00
1/15/66
The Muslem Students Assoc.
U.S. & Canada
20.00
12/14/66
Arizona Tuberculosis, Inc.
2.00
9/8/66
Handi Shop
2.00
9/2/66
The Muslem Students Assoc.
U.S. & Canada
6.00
*55 In addition to these documented payments, petitioner also made cash contributions during those years to various Islamic Centers throughout the United States and to certain miscellaneous funds. On his income tax returns for 1959 through 1964 and for 1966, petitioner claimed charitable contributions in the following amounts: Year
Amount
1959 $ 425.00
1960
525.00
1961
1,382.00
1962
1,950.00
1963
1,000.00
1964
900.00
1966
450.00
In his notice of deficiency, respondent disallowed the deductions in total on the ground that petitioner did not establish that the amounts were expended for charitable purposes. In 1963, petitioner loaned $300 to his friend, Mustapha Adoum, whom he had known since 1948. Although Adoum was in his late seventies and in poor health, petitioner expected *56 to be repaid. In 1966, Adoum informed petitioner that despite his intention to repay the loan he was unable to do so, citing his advanced years, declining health and lack of financial resources. Due to these circumstances, petitioner forgave the $300 debt and claimed a bad debt deduction for such amount on his 1966 tax return. This deduction has been disallowed by respondent. On Schedule C of his joint income tax return for 1965 petitioner claimed a $20,000 loss for business property arising out of an investment in Mexican notes. In his notice of deficiency, respondent disallowed the loss in total. OPINION Issue 1: Understatement of Gross Income From Real Estate Transaction
The first issue before this Court is whether petitioner understated his gross income from the sale of approximately 80 parcels of real property during the years 1959 through 1965. Petitioner contends that he properly reported the 1959, 1960 and 1961 sales on the cost recovery method of accounting and the income from sales in 1962 through 1965 on the installment method. In the alternative, petitioner argues that if he is not entitled to use either of these reporting methods, the real estate contracts and second *57 mortgages received from the buyers should be included in the amount realized under section 1001(b), at a value less than face amounts. Respondent, on the other hand, maintains that not only has petitioner failed to demonstrate his right to report on the cost recovery and/or installment methods, but that based on the record, it is impossible to determine what method petitioner in fact utilized for reporting his income in those years. Respondent further asserts that petitioner failed to produce sufficient corroborative evidence to verify any of the gross profit figures reported on the respective Schedule C forms during that period. Consequently, in the absence of records or other evidence to support petitioner's contentions, respondent determined that petitioner's share of the gain realized from the real estate sales is taxable in the year of those sales to the extent indicated below: Year
Gain Realized [7]
1959
$45,841.80
1960
27,908.18
1961
43,339.90
1962
53,337.15
1963
17,572.35
1964
364.38
1965
3,524.13 After an extensive review *58 of the record and for the reasons set forth below, we must sustain respondent's determination. Petitioner advances two distinct legal arguments in support of his right to report on the cost recovery method. For the sake of clarity, we will consider each argument separately. Petitioner initially argues that the real estate contracts and second mortgages received as consideration in many of the sales from 1959 through 1961 and no ascertainable fair market value at the time of receipt. He concludes, therefore, that he is entitled to defer the recognition of gain until the cash payments received exceed his basis in the homes sold. Based on the record before us, we must reject this contention. Section 1001(a) provides that gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain. Section 1001(b) provides that the amount realized from the sale of property shall be the sum of any money received plus the fair market value of the property (other than money) received. Generally speaking, fair market value has been defined as the price at which property would change hands between a willing *59 buyer and a willing seller, when neither party is acting under any compulsion to buy or sell and both parties are fully informed of all the relevant facts and circumstances. Estate of Wiggins v. Commissioner, 72 T.C. 701 (1979); McShain v. Commissioner, 71 T.C. 998, 1004 (1979). If the fair market value of the property received, in this case real estate contracts and second mortgages, cannot be ascertained, then the transaction is left "open" and the seller can report his gain realized on the cost recovery method. Burnet v. Logan, 283 U.S. 404 (1931); McShain v. Commissioner, supra at 1004. Whether property has an ascertainable fair market value and the amount of such value depends upon the facts and circumstances of each case. Only in rare and extraordinary circumstances, however, will property be considered not to have an ascertainable fair market value. Sec. 1.1001-1(a), Income Tax Regs.
Petitioner's position is that since the buyers typically lacked sufficient funds and credit to obtain financing from outside lenders, the real estate contracts and second mortgages he obtained had no ascertainable value. Although the financial condition of an obligor on a contract or mortgage *60 is an important factor to be considered, Wortham v. Commissioner, 3 B.T.A. 1307 (1926), petitioner failed to offer any evidence showing the financial responsibility or solvency of specific purchasers. Nor did he introduce evidence demonstrating that those buyers did not promptly meet their contractual obligations as they became due. In addition, petitioner made no showing that his right to payment under these instruments was so contingent as to justify open transaction treatment. Cf. Burnet v. Logan, supra.Furthermore, the testimony of both petitioner and Adib Abusharif, his partner in Trade and Mortgage Company, to the effect that these contracts and mortgages were marketable in the Chicago area firmly convinces us that these obligations indeed had a fair market value. Compare, Miller v. United States, 235 F. 2d 553 (6th Cir. 1956). Accordingly, petitioner's first theory must fail. Petitioner's next argument is that the real estate contracts and second mortgages were not the equivalent of cash and, therefore, not amounts realized by a cash basis taxpayer. In support of this contention petitioner relies upon Ennis v. Commissioner, 17 T.C. 465 (1951) and Estate of Hurlburt v. Commissioner, 25 T.C. 1286 (1956). *61 These cases, however, are factually distinguishable from the instant case. In neither of those two cases did this Court make a finding that the contractual obligations involved therein were marketable. Here, on the other hand, the evidence has clearly established that there was a market in the Chicago area for the type of obligations which petitioner received. Moreover, even under this Court's test for determining cash equivalency in Warren Jones Co. v. Commissioner, 60 T.C. 663, 668-69 (1973), revd. 524 F. 2d 788 (9th Cir. 1975), petitioner has failed to prove that these obligations could only be marketed at a substantial discount from their face values. [8] Accordingly, since we must reject both prongs of petitioner's cost recovery argument, he must include the real estate contracts and second mortgages in his income in the year of receipt at their fair market value. Petitioner also argues that he is entitled to the benefits of installment *62 reporting for the real estate sales in 1962 through 1965. This contention, however, is unsupported by the record. Section 453(b) of the Code permits the income from the sale of real property to be reported on the installment basis pursuant to regulations prescribed by the Secretary. Respondent maintains that petitioner failed to properly elect installment reporting for these years in accordance with section 453 and the regulations thereunder. We agree. The relevant regulation is section 1.453-8(b)(1), Income Tax Regs., which provides: A taxpayer who sells or otherwise disposes of real property, or who makes a casual sale or other causal disposition of personal property, and who elects to report the income therefrom on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method. In any taxable year in which the taxpayer receives payments attributable to such sale or other disposition, he must also show in his income tax return the computation of the amount of income which is being reported in that *63 year on such sale or other disposition. This regulation has been held valid. Ackerman v. United States, 318 F. 2d 402 (10th Cir. 1963). On the record before us, petitioner has failed to comply with this regulation. Petitioner's tax returns for the years 1962 through 1964 do not specifically mention or otherwise indicate the election of installment reporting, nor do they set forth the manner by which the gross profit from particular sales was computed. Instead, those returns merely reported various lump-sum figures as gross profit from business without further explanation. Although some details were disclosed on the 1965 return, those details were both vague and confusing. Moreover, the few payment books offered by petitioner to substantiate the figures shown on these returns were wholly inadequate. Even after a careful examination of those records we have no way of determining whether petitioner reported the proper amount of income from the sales. Certainly, petitioner has not maintained records sufficient to clearly reflect income within the meaning of section 1.453.1(f), Income Tax Regs., and section 446 of the Code. The burden of proving that the installment method was properly *64 elected rests on petitioner. That burden has not been met. Accordingly, petitioner is not entitled to report the sales during 1962 through 1965 on the installment method. Having rejected petitioner's primary contentions, it becomes necessary to consider his alternative argument. The thrust of this position is that for purposes of computing gain under section 1001(a), the real estate contracts and second mortgages received should not be included at their face amounts but rather at reduced values. In support of this assertion, petitioner states, on brief, that he was willing to give substantial discounts on the contracts and mortgages. He also maintains that the questionable credit status of the purchasers tended to depress the value of those obligations below face value. Finally, he argues that the real properties themselves were not worth the amount of the contract sales price, thereby showing that respondent overvalued these obligations. In rebuttal, respondent contends that petitioner has totally failed to establish that any discount is warranted and, therefore, the real estate contracts and second mortgages have a fair market value equal to their face values. On the facts *65 before us, we must agree with respondent. The fair market value of the real estate contracts and second mortgages is a question of fact. Some of the factors that enter into this determination include the financial condition of the obligors, the character of the property behind the obligations, whether a ready market exists for the type of property involved, the discount on such property, the interest rates, etc. Although petitioner relies heavily upon the market rate of discount for those obligations, he could only recall one instance in which he actually discounted a mortgage to a third party. Even his testimony as to that transaction, however, was vague and inconclusive. The evidence presented with respect to the financial condition and status of the contract purchasers was similarly deficient. Thus, petitioner's assertion that the contracts and mortgages had little value because the buyers were high credit risks is simply not borne out by the record. On the contrary, the extremely small percentage of contract defaults tends to establish the financial responsibility of those purchasers, lending further support to the respondent's action in valuing those obligations at face. *66 Moreover, there is nothing in the record to support petitioner's contention that the contract prices exceeded the actual value of the properties. In sum, petitioner has failed to offer sufficient evidence to contradict respondent's determination that the fair market values of the real estate contracts and second mortgages equalled their face value. Accordingly, we must sustain that determination. Issue 2: Interest Income. The second issue before this Court is whether, for each of they years 1959 through 1963, petitioner realized interest income from the financing of real property sales in excess of the interest expense incurred on the financed purchase of such properties. Petitioner submits that he properly reported all the interest income generated by the real estate contracts and second mortgages received from the buyers. In challenging that assertion, respondent points to the absence of any records to substantiate petitioner's claim. On the basis of the evidence before us, we must agree with respondent. A careful review of petitioner's income tax returns for 1959 through 1963 reveals the correctness of respondent's determination. None of those returns identify any amount *67 of interest income from real estate sales. Nor do they provide sufficient information from which this Court can ascertain the proper amount of interest income. Moreover, the few records offered by petitioner to support his contention are both confusing and inadequate. Respondent's determination is presumptively correct. Petitioner has simply failed to show that this determination was erroneous. Accordingly, we hold for respondent on this issue. Issue 3: Business Expenses. The next issue is whether petitioner is entitled to deduct expenses incident to the real estate transactions in excess of the amounts allowed by respondent. Relying on Cohan v. Commissioner, 39 F. 2d 540 (2d Cir. 1930), petitioner contends that he presented sufficient evidence to support additional deductions for repairs, mortgage expenses, commissions and other miscellaneous business expenses. We disagree. At trial, petitioner was generally unable to recall specific expense items or the amounts thereof. His testimony was vague and often incomprehensible. Furthermore, the documentary evidence he offered does not substantiate his claim. Aside from being incomplete, the vast majority of those documents *68 have no connection with petitioner. Again, the burden of proof is one petitioner to prove respondent's determination is wrong. Given the state of the record on this issue, we hold that respondent's determination was reasonable and should not be disturbed. Issue 4: Charitable Contributions. We must decide whether petitioner is entitled to deduct claimed charitable contributions for the years 1959 through 1964 and for 1966. Section 170(a) allows a deduction for charitable contributions paid within the taxable year. Section 170(c) defines a "charitable contribution" as a contribution or gift to or for the use of certain qualified charities. Respondent takes the position that petitioner has failed to prove that the donees listed in the summary of cancelled checks and receipts are qualified charities within the scope of section 170(c). We agree. The record is devoid of any evidence establishing the purpose or operation of the various societies, associations and organizations specified therein. In addition, the record reveals that a significant number of the payments were made to individual recipients. Although petitioner testified that these payments were intended to benefit the *69 charitable organizations which those individuals represented, there is no evidence that the funds were ever under the direct control of those organizations. Winn v. Commissioner, 67 T.C. 499, 511 (1976), cf., Peace v. Commissioner, 43 T.C. 1, 7-8 (1964). Accordingly, deductions for such contributions must be denied. Respondent further contends that the cash contributions claimed should be disallowed for lack of substantiation. Petitioner argues that despite the absence of documentary evidence, he has sufficiently substantiated these contributions by oral testimony. Although we found petitioner's testimony to be credible, we must sustain respondent's determination because petitioner made no showing that the recipients of such cash donations were qualified section 170(c) charities. Issue 5: Bad Debt Loss.
The next matter for consideration is petitioner's claim that he is entitled to a bad debt deduction of $300 in 1966 as a result of his loan to Mustapha Adoum. Since we find that there was a bona fide debt running from Adoum to petitioner, the only issue is whether this debt became worthless in 1966. Section 166(a)(1) allows a deduction for "any debt which becomes worthless within *70 the taxable year." Whether a debt is worthless depends on all the surrounding facts and circumstances. Mueller v. Commissioner, 60 T.C. 36, 41 (1973), revd. on another ground, 496 F. 2d 899 (5th Cir. 1974). In order to establish that a debt has become worthless, a creditor must prove that he made every reasonable effort to locate the debtor and to collect the debt. Allen-Bradley Co. v. Commissioner, 112 F.2d 333, 334-335 (7th Cir. 1940), affg, 39 B.T.A. 1243 (1939); A. Finkenberg's Sons, Inc. v. Commissioner, 17 T.C. 973, 984 (1951). The law, however, does not require a creditor to engage in futile acts. If the creditor can show that the debtor's financial condition was such that attempts to collect would have been useless, then the creditor is excused from collection activities. Sec. 1.166-2(b), Income Tax Regs.; Sherman v. Commissioner, 18 T.C. 746, 752 (1952). Respondent contends that petitioner made no effort to collect the debt, but instead, gratuitously discharged Adoum from any obligation to repay the $300. In respondent's view, this constitutes a gift rather than a deductible bad debt. Petitioner challenges that contention, asserting that his action was based upon Adoum's *71 severe financial straits which rendered him unable to satisfy the obligation. After considering the evidence presented, particularly the testimony addressed to Adoum's health and financial condition, we conclude that petitioner was justified in determining the debt to be worthless in 1966. Under these circumstances, it was entirely reasonable for petitioner to refrain from instituting legal proceedings to enforce the debt since such action, in all probability, would have been futile. Accordingly, the $300 bad debt deduction for 1966 should be allowed. Issue 6: Loss of Business Property. Petitioner claimed $20,000 loss of business property as a deduction on his 1965 income tax return. In support of this deduction, petitioner testified that, after being solicited by certain mexican individuals, he invested $50,000 in Mexican land sale notes allegedly secured by real estate. He further testified that after discovering that those people had defrauded him, he traveled to Mexico seeking redress, but was only able to recover a portion of his investment. Based on these events, petitioner contends that he suffered either a business loss or a theft loss deductible under section 165. Respondent *72 maintains that petitioner has failed to meet his burden of proving that any deductible loss was sustained in 1965. On the record before us, we must agree. Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. The loss must be evidenced by closed and completed transactions and fixed by identifiable events occurring in such taxable year. Sec. 1.165-1(d)(1), Income Tax Regs. In the present case, all we have is petitioner's vague and unsubstantiated testimony that he suffered a loss as a result of the fraud perpetrated by certain unnamed individuals. The land sale notes were not produced nor did petitioner offer any other documentary evidence to support his claim. Moreover, petitioner failed to provide the Court with even the most basic details surrounding this transaction. Thus, the record contains no evidence indicating the year of the fraud or its discovery, the details of the fraudulent conduct, the nature of the investment or the circumstances surrounding the partial recovery of that investment. Although he admitted that Adib Abusharif had also purchased some notes, petitioner *73 neither sought nor was he provided with corroborating testimony by his partner. Since petitioner failed to carry his burden of proof on this issue, we must sustain respondent's determination. Issue 7: Section 6653(a) Additions to Tax
The final issue for our decision is whether petitioner is liable for the additions to tax under section 6653(a) for the years 1959 through 1966. That section provides that if any part of the underpayment is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. The burden of proof on this issue is upon petitioner. Marcello v. Commissioner, 43 T.C. 168, 182 (1964), affd, 380 F. 2d 499 (5th Cir. 1967); Courtney v. Commissioner, 28 T.C. 658, 669 (1957). Respondent determined that the additions should be imposed because petitioner substantially understated his income from the real estate transactions and failed to maintain adequate records from which his tax liability should be computed. Respondent argues that since petitioner failed to prove that this determination was erroneous, the penalty should be sustained. In challenging respondent's determination, *74 petitioner contends that he kept accurate records for all the properties and that such records were submitted to and examined by respondent. Petitioner, however, never produced all these records for our benefit. The few records actually produced at trial were clearly inadequate to permit a proper computation of petitioner's tax liability. Moreover, petitioner did not offer any credible testimony justifying his failure to maintain such records. We find it hard to believe his testimony that all these records were either stolen or destroyed by fire and flood. Accordingly, since petitioner failed to carry his burden of proof, he is subject to the section 6653(a) additions to tax for each of the years in issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Al Bayan is an Arabic newspaper published in New York. ↩
3. Husseim Karoub is the reverend of an Islamic Mosque in Detroit, Michigan. ↩
4. Ghazi Al-Hachim is an individual on the Board of Directors of an Islamic Mosque in Gary, Indiana. ↩
5. Dr. M. T. Medhi is the publisher of a newspaper and head of an organization called the Action Committee. ↩
6. Zafar and Muhammad Abdullah are individuals in charge of the Islamic Center in San Francisco.↩
7. These figures from respondent's brief are substantially lower than the amounts asserted in the notice of deficiency. Respondent has apparently conceded the difference.↩
8. Although Warren Jones Co. v. Commissioner, 60 T.C. 663, 668-69 (1973), revd. 524 F. 2d 788↩ (9th Cir. 1975), was reversed by the Ninth Circuit, petitioner's argument also would fail under that court's approach for determining gain under section 1001.