T.C. Memo. 2019-159

UNITED STATES TAX COURT

JOYNER FAMILY LIMITED PARTNERSHIP, GARY JOYNER
REVOCABLE TRUST, A PARTNER OTHER THAN THE TAX MATTERS
PARTNER, JANEL JOYNER REVOCABLE TRUST, A PARTNER OTHER
THAN THE TAX MATTERS PARTNER, AND JOYNER INVESTMENT
COMPANY, INC., TAX MATTERS PARTNER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24704-15.                    Filed December 11, 2019.

Juan F. Vasquez, Jr., Jaime Vasquez, A. Leonides Unzeitig, and Adrian

Ochoa, for petitioners.

Lauren N. May, Danielle R. Dold, Christa A. Gruber, Tess deLiefde, and

Thomas F. Harriman, for respondent.

**[*2]**    MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Joyner Family Limited Partnership (JFLP) is a small, family-run business that sells land and mobile homes primarily to low-income, high-credit-risk individuals under seller-financed deferred payment plans.  It received cash payments from the buyers of less than $500,000 during 2010, 2011, and 2012 (years at issue) and is facing an $8.7 million adjustment on the basis of the face values of promissory notes it received in the sales, the substantial majority of which were defaulted on and went unpaid.

On May 11, 2015, respondent issued a notice of final partnership administrative adjustment (FPAA) to JFLP for the years at issue, asserting that JFLP is not entitled to use the section 453 installment method to report the mobile home sales and must report income from the sales upon receipt of the notes, increasing JFLP's gross receipts by $1,759,306, $1,250,278, and $606,412 for 2010, 2011, and 2012, respectively.[1]  For 2010 he also asserted a section 481 adjustment for pre-2010 sales of approximately $3.8 million.  He did not assert an adjustment for JFLP's sales of land that did not include mobile homes (land-only

---

[1]Unless otherwise stated all section references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are rounded to the nearest dollar.

[*3] sales).[2]  In the FPAA respondent allowed JFLP substantial worthless debt deductions for the defaulted-on notes, which reduced JFLP's taxable income for 2010 and resulted in tax losses of $281,332 and $953,657 for 2011 and 2012.

Respondent filed an amendment to the answer, asserting for the first time that JFLP was not entitled to report its land-only sales under the installment method and increasing JFLP's 2010 and 2011 gross receipts by $1,001,665 and $19,328, respectively, for the land-only sales.  Respondent also asserted that JFLP was not entitled to the worthless debt deductions that he had previously allowed. As a result of these further assertions, respondent is seeking increases in JFLP's taxable income for the years at issue of over $8.7 million.

The issues for decision are:  (1) whether JFLP is entitled to use the section 453 installment method to report the mobile home sales or the land-only sales; we hold for mobile homes sales, it is not, and for land-only sales, it is; (2) whether respondent may change JFLP from the cash receipts and disbursements method of accounting (cash method) to the accrual method; we hold respondent may not; and (3) whether respondent abused his discretion by requiring JFLP to report its income from the mobile home sales upon receipt of the notes on the basis of the

---

[2]For simplicity, we refer to a sale that included land and a mobile home as a mobile home sale and a sale of land without a mobile home as a land-only sale.

[*4] notes' face values and asserting a related section 481 adjustment; we hold he did.

FINDINGS OF FACT

JFLP had its principal place of business in Arkansas when the petition was timely filed. Petitioners Gary Joyner Revocable Trust and Janel Joyner Revocable Trust were limited partners with a 49.5% interest each. Joyner Investments Co., Inc., is an Arkansas corporation, the tax matters partner, and a 1% general partner.

I.    Background

Gary and Janel Joyner met in junior high school and married after high school graduation. In 1985 they began to purchase large tracts of land in rural Arkansas and subdivide the land for resale. They purchased their first tract of land, an 80-acre parcel, from a great-uncle, Dean Martin, who had encouraged them (and others in his church) to invest in real estate and subdivide and resell the land. Mr. Martin financed the purchase and retained title until the Joyners paid him in full, approximately 14 years later.

The Joyners subdivided the land into 10 to 12 lots. Before subdividing the land, they performed a percolation test of the soil to determine the rate of water absorption. They laid gravel roads to the subdivided lots but did not make improvements to the lots. The electric company installed electrical poles on the

**[*5]** land at no charge. The Joyners marketed the lots primarily to low-income individuals. The buyers used the land for mobile homes that they purchased from mobile home retailers and financed through third-party financing companies, some of which specialized in financing the purchase of mobile homes. The buyers used the mobile homes as their permanent residences. Typically, the buyers removed the wheels from the mobile homes and placed them on structural supports. The buyers installed septic tanks and water wells or water lines. They also paid to lay their own driveways and provided their own electrical hookups.

Initially the Joyners operated the business in their individual capacities. In 1998 they organized JFLP on the advice of their certified public accountant (C.P.A.), Richard Bell of Bell & Co., P.A. (Bell & Co.). Mr. Martin referred the Joyners and the other individuals that he had encouraged to invest in real estate to Bell & Co. Starting in the mid-1980s, Bell & Co. had approximately 10 to 12 clients who were engaged in similar real estate businesses in the rural Arkansas community where JFLP was located. Bell & Co. has prepared the Joyners' joint returns and the entity returns for over 25 years.

In total, the Joyners and JFLP have purchased at least 16 parcels of land consisting of over 2,300 acres and have subdivided the land into over 400 lots. The sizes of the lots ranged from 4 to 10 acres in the earlier years and 1 to 2 acres

[*6] for land purchased after 2002. JFLP often owned the land for a significant number of years before selling all the lots. In the beginning, the Joyners purchased land through seller-financing, including additional purchases from Mr. Martin. Later they obtained bank loans for the purchases secured by the land, and JFLP resold the subdivided lots subject to the bank mortgages. JFLP remained liable for the bank loans and continued to repay them. As of the end of 2010 JFLP had outstanding mortgages on five parcels.

At first, JFLP sold only the land. Around 2000 JFLP started to purchase used mobile homes and resell them on its lots. It entered into this new line of business slowly. JFLP sold its first mobile home in 1999 and two more in 2001. Land-only sales remained a significant percentage of its sales until 2005, the first year JFLP sold more mobile homes (30) than lots (16). For the most part, JFLP's purchases of mobile homes were sporadic with a high of 11 purchases in 2008 and 2010 and as few as 1 to 4 in other years, especially the earlier years, 2001 through 2004. JFLP often bought mobile homes in foreclosure sales; some of those homes were on JFLP's lots. During the years at issue JFLP paid $7,000 to $17,000 for the used mobile homes, depending on the size of the mobile home, single or double wide, for an average of approximately $11,000.

**[*7]**  The economic downturn in 2008 significantly affected the mobile home market in JFLP's area.  Sources of third-party financing dried up, and many mobile home retailers went out of business.  The prices that JFLP paid for used mobile homes also dropped significantly.  JFLP paid as much as $23,900 in 2002 and $27,000 in 2006 for used mobile homes.  Even these higher prices were generally less than half the prices of new mobile homes.

II.  Sales

Mr. Joyner was the sales agent and was responsible for purchasing used mobile homes to resell.  Ms. Joyner performed bookkeeping and administrative work.  JFLP did not have any other employees but engaged several independent contractors with respect to the mobile homes that JFLP offered for sale, to relocate mobile homes that JFLP purchased, to provide electrical hookups, to install water wells or water lines, septic tanks, and air conditioning units, to construct gravel driveways, and to perform general maintenance.

During the years at issue JFLP offered options to rent or purchase mobile homes or to purchase land only.  Typically, JFLP's customers had not previously owned homes.  They were primarily low income, had poor credit histories and unstable employment histories, and could not obtain traditional financing to purchase homes.  JFLP offered affordable housing.  Mr. Joyner determined the

[*8] amount of the monthly payment on the basis of what the customer could afford. Monthly payments ranged from $100 to $700.

The Joyners are well respected in the community. They rarely declined to sell to a prospective buyer except if they suspected the buyer was involved with drugs. Their philosophy was to give people a chance. For some buyers JFLP obtained the necessary information to perform credit checks, but the Joyners did not perform credit checks because of the costs of running credit checks and because Mr. Joyner believed that the buyers' poor financial situation made the credit checks pointless. Mr. Joyner would ask prospective buyers whether they had jobs, but he did not request any documentation, such as pay stubs, or otherwise verify their employment or income.

For each sale JFLP and the buyer executed a purchase agreement and a note. The Joyners used forms purchased from an office supply store. The agreement stated the sale price, the amount of the monthly payment, and the interest rate. The agreement did not state the length of time that it would take for the buyer to pay the entire sale price, state the number of payments necessary to pay off the loan, or include an amortization schedule. The Joyners typically did not collect downpayments because the buyers could not afford to make them.

**[*9]**  Under the purchase agreement, JFLP retained legal title until the buyer paid the full sale price.  The purchase agreement prohibited the buyer from recording the agreement without JFLP's consent.  Agreements from approximately 60 properties, representing approximately 15% of the sales over the history of JFLP's business, were recorded.  The buyer had the right to immediate possession and occupancy and was required to pay property tax, maintain insurance, and maintain and repair the property.  The purchase agreement prohibited the buyer from selling, transferring, or assigning the property without JFLP's written consent.  For some properties, the buyers paid the property taxes; for others, JFLP paid them and billed the buyers.  Because JFLP retained legal title, nonpayment of property taxes would have jeopardized its ownership of the property.  The buyers often purchased insurance as required by the purchase agreements.  However, the Joyners purchased insurance if they knew a buyer had not.

Like the purchase agreement, the note did not state the term of the loan or the number of payments required to pay the note in full or include an amortization schedule.  Amortization of the notes on the basis of the principal amounts, monthly payments, and interest rates would result in terms ranging from 11 to 36 years and an average term of 22 years for the notes executed during the years at

[*10] issue. The note stated that it was a lien against the property until the sale price was paid in full.

On default, the note granted JFLP the right to declare the unpaid balance due and payable after 30 days' notice. The purchase agreement also gave JFLP the right to declare the entire unpaid balance due and payable; however, it also provided JFLP with the alternative of rescinding the sale. In all instances, JFLP chose to rescind the sale. It never attempted to collect the unpaid balance and never declared the unpaid balance on a note due and payable. When JFLP rescinded a sale, the purchase agreement gave JFLP the right to retain all payments "not as a penalty, but as rent of the property". Under the purchase agreements JFLP could demand that the buyers vacate the property, or if the buyer did not vacate the property, JFLP could convert the sale to a rental at a monthly rent equal to the monthly payment. On occasion, a previous buyer purchased a different mobile home from JFLP and returned the first mobile home to JFLP, referred to as a swap. JFLP did not give the buyer any credit against his new purchase for prior payments.

JFLP executed approximately 450 purchase agreements and notes from 1999 through 2009 ranging from a high of 61 land-only sales in 2002 to a low of 28 total sales in 2007. During the years at issue it had the following mobile home

[*11] and land-only sales, with total sale prices and reported income from payments received as follows:

| Year | No. of sales | Total sale price | Reported income |
|------|--------------|------------------|-----------------|
| 2010 | 21 | $2,648,700 | $149,480 |
| 2011 | 27 | 2,023,600 | 146,599 |
| 2012 | 19 | 1,352,541 | 153,665 |

JFLP had unpaid balances on 221 sales during 2010, 208 sales during 2011, and 181 sales during 2012. Its gross profit margins ranged from 30% to 84% during the years at issue with an average profit margin of 71%, calculated using an average sale price of $77,481 and an average cost basis of $22,532. JFLP listed the notes' unpaid balances as "deferred installment income" as liabilities on the balance sheets of its partnership returns, reporting $5,516,199, $4,940,699, and $3,956,235 for the end of 2010, 2011, and 2012, respectively.

III. Rentals

JFLP began renting mobile homes around 2006. It slowly entered into this new line of business. JFLP participated in the federally funded low income housing program known as Section 8 housing for renters who met the maximum income threshold. Under the program the local housing authority paid rent assistance directly to JFLP and required the renters to commit to a one-year lease.

**[*12]** During the years at issue JFLP executed the rental agreements and reported rental income as follows:

| Year | No. of agreements | Rental income |
|------|-------------------|---------------|
| 2010 | 10 | $37,233 |
| 2011 | 25 | 90,272 |
| 2012 | 64 | 232,050 |

At the time of trial, most of JFLP's gross receipts derived from rentals rather than sales. The Joyners preferred to rent because of the stability of rental payments under the Section 8 housing program and the tax issues they are facing here. JFLP has allowed buyers to convert their sales to rentals to take advantage of the Section 8 housing program.

IV.   Repossessions

JFLP experienced a very high default rate on mobile home sales during the years at issue. When a buyer failed to make a monthly payment, the Joyners often allowed the buyer to pay late and would not evict the buyer, particularly if he was facing a financial hardship or a medical problem making it difficult for him to work. When the Joyners did demand that a buyer vacate the property, it was usually after his missing multiple payments. The Joyners would send the defaulting buyer a notice to vacate that they based on a form purchased from an

[*13] office supply store.  Generally, the buyers voluntarily vacated after receiving the notice.  On a few occasions, JFLP needed assistance from the sheriff's office to evict a buyer.  JFLP did not take legal action or otherwise attempt to collect the unpaid balance of the note.  Instead, it repossessed the mobile home and attempted to resell it.  It reduced its deferred installment income by the note's unpaid balance.  JFLP did not obtain appraisals for the mobile homes or land that it repossessed.  It often needed to make repairs to the repossessed mobile homes to make them livable.  JFLP did not repossess property sold in land-only sales.

On its partnership returns JFLP accounted for the repossessions as generating income, reporting the portions of the buyers' payments that it had previously allocated to basis recovery as "gain on repossession".  During the years at issue JFLP repossessed mobile homes, decreased its deferred installment income, and reported gain on repossession as follows:

| Year | No. repossessed | Decrease in deferred income | Gain on repossession |
|------|-----------------|-----------------------------|----------------------|
| 2010 | 26 | $1,161,607 | $28,007 |
| 2011 | 35 | 1,531,600 | 3,541 |
| 2012 | 35 | 1,560,069 | 31,594 |

For sales during the years at issue, approximately 31.9% of the buyers defaulted within one year, 60.9% defaulted within two years, 79.7% defaulted

[*14] within three years, and 92.8% defaulted within six years. Of the 69 installment sales during the years at issue, only 5 buyers had not defaulted by the time of trial. When a buyer defaulted in the same year as the purchase, JFLP reported the monthly payments as income from sales, not as rent.

Buyers often made improvements and repairs to the mobile homes, adding porches and decks, replacing carpets and flooring, remodeling bathrooms, renovating kitchens, adding insulation, repairing structural supports, and repairing or replacing septic tanks. When JFLP repossessed a mobile home, it did not reimburse the buyer for the improvements and did not consider whether the improvements increased the value of the mobile home above the amount still owed. The mobile homes depreciated over time.

In a significant number of instances the buyer did not maintain the home and left it in poor condition when he defaulted and vacated. Some buyers also left behind old furniture, broken appliances, abandoned cars, and unwanted pets. When JFLP repossessed a mobile home, it often had to repair the mobile home to make it livable before it could resell or rent it. On occasion, a repossessed mobile home was beyond repair or repairs were too costly for JFLP, and JFLP disposed of the mobile home. Under the purchase agreement, the property left on the land or

[*15] in the mobile home when a buyer vacated is considered abandoned and JFLP had the right to dispose of it.

V.    Books and Records

When the Joyners formed JFLP, Mr. Bell recommended that it use the cash method for its books and records and for tax purposes. At that time JFLP sold only real estate, and Mr. Bell recommended that JFLP report income from the land sales under the installment method. He also recommended this method to his other clients in the business of selling real estate. He viewed this approach as conservative and believed that it appropriately matched tax liability with the client's ability to pay tax upon receipt of the monthly payments. He sought legal advice from three different tax attorneys who each agreed with the use of the installment method. When it began selling mobile homes, JFLP continued to report its sales in this manner at Mr. Bell's recommendation. On the basis of his experience, Mr. Bell believed that JFLP's method of accounting was the industry standard for reporting income from seller-financed deferred payment sales in its rural Arkansas community. Bell & Co.'s other clients' returns have also been audited, and the audits resulted in no adjustments.

Ms. Joyner maintained the books and records using QuickBooks and an Excel spreadsheet developed by Bell & Co. The spreadsheet included formulas to

[*16] calculate the portion of each monthly payment attributable to principal, interest, and a nontaxable return of basis. The spreadsheet also tracked the "deferred gross profit" on the sales, a portion of which JFLP realized on each payment. Ms. Joyner did not have any formal training in bookkeeping. LaNell Sterling, a C.P.A. at Bell & Co. with 30 years of accounting experience, explained to Ms. Joyner how to maintain the books, use QuickBooks and the spreadsheet, and use an accounts receivable system to track unpaid balances. When JFLP sold a mobile home, Ms. Joyner increased the deferred installment income, which JFLP referred to as accounts receivable for book purposes, for the sale price. On a repossession, she removed the unpaid balance from the deferred installment income and restored the property to the assets account on the balance sheet. She recorded all payments from buyers and renters including cash that JFLP received. JFLP did not have any unrecorded or unreported cash receipts. We find that JFLP did not have any unreported gross receipts.

VI.   Tax Returns

Bell & Co. prepared JFLP's partnership returns for the years at issue. On those returns JFLP checked the box indicating that it used the cash method. JFLP used the installment method to report income from its sales. JFLP did not report income from the receipt of the notes. It reported income as it received payments

[*17] on the notes, allocating portions to gross receipts, nontaxable recovery of basis, and interest income. It also reported "section 453 interest" income to account for the benefit of the deferral in reporting its income on the sales and reported "gain on repossession" for each repossession, computed as the sum of the deferred gross profit at the time of the repossession and the original cost basis, less the unpaid balance of the sale price. JFLP did not report inventory on its partnership returns or adjust its gross receipts for the cost of goods sold. It deducted expenses for the year of payment.

VII.   Expert Witnesses

Respondent presented expert testimony of Thomas Reed on the fair market value of the land JFLP sold during the years at issue. Mr. Reed did not provide his opinion on the values of the mobile homes. Respondent did not present any expert testimony on the fair market values of the notes.

Petitioners presented testimony of two experts, Albert Harkins and Taylor West, on the marketability of the notes and the notes' fair market values. Mr. Harkins has over 40 years of banking experience, including experience in real estate and mobile home financing and in the evaluation of loans for reselling in a secondary market. He testified to numerous problems that affect the marketability of the notes, including problems with the terms and executions of the notes and

[*18] purchase agreements, JFLP's business practices, the high default rates, and JFLP's outstanding mortgages on the land. He identified the lack of credit checks and the buyers' inability to obtain bank loans as support for a finding that the notes lack marketability. He concluded that the notes were not marketable.

Mr. West is the managing director of valuation advisory services at Duff & Phelps. In his report, dated January 12, 2018, he opined that the fair market values of the notes could not be determined without making extraordinary assumptions that would make the valuation unreliable. He relied on the definition of an extraordinary assumption in Uniform Standards of Professional Appraisal Practice:

> an assumption * * * which, if found to be false, could alter the appraiser's opinions or conclusions.
>
> Comment: Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

Appraisal Standards Board of The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, 2016-2017, at 3.

Mr. West identified multiple extraordinary assumptions that he would need to make to value the notes, including assumptions regarding the probability and

[*19] timing of a default at the time of each sale, JFLP's ability to collect the unpaid balance on a default, and the existence of a willing buyer for the notes. He testified to multiple problems with the notes including inadequate information collected about the buyers' financial situations and creditworthiness, the conversion of sales to rentals, including conversions after defaults, the costs associated with collecting on defaulted-on notes, and the enforceability of the notes. He concluded that on the basis of these issues any valuation of the notes would be unreliable. Mr. West further testified that to determine a fair market value, a market must exist; and after due diligence, he was unable to identify a market for the notes. Respondent did not present any credible evidence that a market did exist.

## OPINION

Respondent asserts that JFLP is not entitled to use the section 453 installment method because it is a dealer. Petitioners do not challenge JFLP's dealer status for its mobile home sales; they do for the land-only sales. Instead, they argue that JFLP used a hybrid method to report its mobile home sales under the umbrella of its overall cash method of accounting and that hybrid method clearly reflects income. According to petitioners, the hybrid method makes two "tweaks" to the installment method. For the first "tweak", JFLP reports "section

[*20] 453 interest" on the principal portion of each payment to compensate for the benefit of the deferred income reporting. This alleged tweak aligns with the requirement of section 453(l)(3), applicable to installment sales of unimproved residential lots, that increases the tax on payments received under installment obligations by an interest amount determined under section 453(l)(3)(B). Second, for repossessed mobile homes, it reports "gain on repossession" for the payments that it previously allocated to nontaxable basis recovery. Accordingly, for repossessed properties, JFLP ultimately reported the full amounts of the payments it received as income.

Petitioners advance multiple alternative arguments if JFLP cannot use the hybrid installment method. They argue that respondent's method does not clearly reflect income and respondent cannot change JFLP from an incorrect method to another incorrect method. They argue that respondent's method does not comport with economic reality and is inconsistent with the Code, regulations, and caselaw because respondent incorrectly taxes JFLP on the notes' face values and JFLP should be taxed on the notes' fair market values. As a second alternative argument, they argue that under the purchase agreement, upon a default all payments are treated as rent and the Court should treat the payments as rent and not tax JFLP on its receipt of the note. Third, they argue that if we hold that JFLP

**[\*21]** must report the sales on the basis of the notes' face values, JFLP is entitled to worthless debt deductions for the unpaid balances of the defaulted-on notes as respondent initially allowed in the FPAA.

I.      Section 453 Installment Method

Section 453 allows taxpayers to delay recognition of gain until they receive payments on installment sales. An installment sale is defined as "a disposition of property where at least 1 payment is to be received after the close of the taxable year in which the disposition occurs." Id. subsec. (b)(1). The seller may defer gain recognition over the period of the installment payments rather than being taxed on the entire gain in the year of the sale or upon receipt of a debt obligation evidencing the installment sale. Id. subsec. (a). The seller must recognize income for the proportion of payments received during the tax year that the gross profit bears to the total contract price. Id. subsec. (c). A seller is required to use the section 453 installment method for all qualifying installment sales unless it elects out of the installment method. Id. subsecs. (a), (d)(1). Dealers of real property (other than unimproved residential lots) or inventories of personal property do not qualify for section 453 reporting. Id. subsecs. (b)(2), (l)(1). A seller of unimproved residential property is excepted from the definition of a dealer and is

**[\*22]** permitted to report its sales under the installment method. Id. subsec. (l)(2)(B)(ii)(II).

### A. Land-Only Sales

JFLP made land-only sales during 2011 and before 2010 that are part of the section 481 adjustment.[3] Respondent asserted for the first time in the amendment to the answer that JFLP cannot report the pre-2010 and 2011 land-only sales under section 453 because the land was improved. The amendment to the answer increases JFLP's gross receipts for the years at issue by over $1 million. We previously held that respondent has the burden of proof on this issue.

A residential lot is land upon which the purchaser intends to construct a dwelling unit for use as his residence. Wang v. Commissioner, T.C. Memo. 1998-127. JFLP's buyers purchased the land for mobile homes that they used as their residences. Respondent has not challenged the permanent placement of a mobile home as the construction of a dwelling unit. We hold that it does in this case.

---

[3]As an alternative, petitioners argue that we should divide each mobile home sale into two separate transactions, the sale of a mobile home and the sale of land, and allow JFLP to report the land sale portion under the installment method. They argue that under State law the mobile homes are personal property, not real property, because they are not affixed to the land. However, the facts establish that the mobile homes were permanently affixed to the land. There is no factual basis to separate a mobile home sale into two transactions for tax purposes, and we will not further address this argument.

[*23] Instead, respondent contends that JFLP improved the land by adding driveways, septic tanks, water wells, and electrical hookups to the benefit of the individual lots. He cites portions of the transcript and record that do not support his contention that JFLP made these alleged improvements. We found credible Mr. Joyner's testimony that he did not make the types of improvements that respondent alleges. Mr. Joyner credibly testified that when he started selling land he added roads to access the subdivided lots and the local electric company installed poles without charge. The buyers installed driveways, septic tanks, water wells, and electrical hookups to mobile homes that they purchased and financed through third parties. This changed when JFLP started selling mobile homes. JFLP made the improvements identified by respondent for mobile homes that it sold on the lots. We find that JFLP did not make improvements to the lots in the land-only sales. JFLP is not a dealer with respect to the land-only sales and is permitted by the Code to report its land-only sales under section 453.[4]

B.    Mobile Home Sales

Petitioners argue that JFLP used a hybrid installment method that is the industry standard within its local real estate industry. We find that petitioners concede that JFLP is a dealer with respect to its mobile home sales and cannot

---

[4]JFLP has not repossessed property sold in a land-only sale.

**[\*24]** report the sales under section 453. Both Mr. Bell and Ms. Sterling credibly testified about their familiarity with similar real estate businesses in JFLP's rural Arkansas community and the development of JFLP's real estate activities. They credibly testified that other businesses in the local community used the same installment method. Mr. Bell sought advice from three independent tax attorneys before recommending the installment method to his clients.[5] Bell & Co.'s other clients also have faced audits relating to their use of the installment method that concluded without any adjustments or changes to their methods of accounting. Respondent counters that Bell & Co.'s 10 to 12 clients do not constitute an industry and no industry standard exists. He further argues that Mr. Bell and Ms. Sterling are not experts on the industry standard.

We find Mr. Bell's and Ms. Sterling's testimony credible. The regulations under section 446 make accepted practices with a particular trade or business a relevant consideration to the determination of whether a method of accounting clearly reflects income. See sec. 1.446-1(a)(2), Income Tax Regs. (providing that a method of accounting "ordinarily" will clearly reflect income when it "reflects the consistent application of generally accepted accounting principles in a

---

[5]Respondent mischaracterizes statements by petitioners' prior counsel as advice that JFLP was not entitled to use the installment method.

[*25] particular trade or business in accordance with accepted conditions or practices in that trade or business"). However, the question with respect to the installment method does not involve the clear reflection of income. Rather, using the installment method for dealer dispositions is statutorily proscribed for JFLP. Sec. 453(b)(2)(A). JFLP is a dealer with respect to its mobile home sales. An industry standard cannot condone the use of a method of accounting that is expressly prohibited by the Code. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-535 (1979).

Similarly, while taxpayers can use a combination of accounting methods, the methods used in combination must be "permitted under regulations prescribed by the Secretary." Sec. 446(c)(4). For its mobile home sales, JFLP is prohibited from using the section 453 method, as a hybrid or in combination with other methods. Furthermore, we do not agree with the characterization of JFLP's method as a hybrid method, a position petitioners assert for the first time in their briefs. Rather, JFLP improperly used the installment method. It attached a statement to its return for each year at issue that it used the section 453 installment method. We hold that pursuant to section 453 JFLP is not entitled to report its mobile home sales under the installment method, as part of a hybrid method or otherwise.

**[\*26]** II.     Section 1001 Computation of Gain

JFLP must realize income from its mobile home sales pursuant to section 1001. Under section 1001(a) and (b), the amount of the gain is the excess of the amount realized from the sale over the taxpayer's adjusted basis in the property sold; the amount realized includes money received plus the fair market value of property (other than money) received. Taxpayers must compute their taxable income in accordance with their method of accounting.[6] See sec. 451(a) (requiring taxpayers to include items in gross income for the year they were received, unless, under the taxpayer's method of accounting, the amount is properly accounted for in a different period). A cash method taxpayer reports income when it is actually or constructively received. Sec. 1.451-1(a), Income Tax Regs. An accrual method

---

[6]Sec. 1.1001-1(g), Income Tax Regs., provides that the amount realized attributable to debt instruments issued in exchange for property is the issue price subject to the original issue discount provisions irrespective of the taxpayer's method of accounting. It further provides for separate treatment for contingent payment debt instruments. Special rules also exist for debt instruments given in exchange for the use of property. See sec. 467. Respondent did not argue that the regulation applies. Accordingly, we do not consider it. Respondent's decision not to address the regulation is understandable given the speculative nature of JFLP's arrangements with the buyers. In practice, both JFLP and the buyers treated the sales as contingent on the buyers' continued use of the homes. The buyers defaulted on the notes at extremely high rates; they abandoned the mobile homes and did not try to enforce equitable interests on the basis of their payments. JFLP did not seek to enforce the purchase agreements or collect on the unpaid notes. See Felt v. Commissioner, T.C. Memo. 2009-245 (considering cash equivalency of note with stated interest rate), aff'd, 433 F. App'x 293 (5th Cir. 2011).

[*27] taxpayer recognizes income when "all the events have occurred that fix the right to receive the income and the amount of the income can be determined with reasonable accuracy." Sec. 1.446-1(c)(1)(ii), Income Tax Regs. Generally, under the "all events" test accrual method taxpayers recognize income when it is paid, due, or earned, whichever occurs first. See, e.g., Schlude v. Commissioner, 372 U.S. 128, 133 n.6 (1963).

In the FPAA respondent asserted that JFLP cannot use the installment method to report its mobile home sales. In his posttrial brief he argues that JFLP must report income from the mobile home sales under the accrual method. JFLP's partnership returns state that JFLP is a cash method taxpayer. Accordingly, we find that respondent is asserting his authority to change a taxpayer's method of accounting under section 446(b) from the cash method to the accrual method on the basis that JFLP's method of accounting does not clearly reflect its income. It is clear that respondent seeks this change in accounting with respect to the mobile home sales; however, we are uncertain of respondent's intended effect with respect to JFLP's overall method of accounting.

The term "method of accounting" is used to describe both an overall method of accounting and the accounting treatment of any item. The regulation lists examples of overall methods, "the cash receipts and disbursements method, an

[*28] accrual method, combinations of such methods, and combinations of the foregoing with various methods provided for the accounting treatment of special items." Sec. 1.446-1(a)(1), Income Tax Regs. A method of accounting is the consistent treatment of any recurring, material item, whether that treatment is correct or incorrect. Bank One Corp. v. Commissioner, 120 T.C. 174, 282 (2003), aff'd in part, vacated in part sub nom. JP Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006); H.F. Campbell Co. v. Commissioner, 53 T.C. 439, 447 (1969), aff'd, 443 F.2d 965 (6th Cir. 1971). A method of accounting may exist without a pattern of consistent treatment, but in most instances an accounting method is not established without such consistent treatment. Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.

As a general rule taxpayers must compute their taxable income under the method of accounting that they use to compute their income in keeping their books. Sec. 446(a). A further requirement is that the taxpayer's chosen method clearly reflect its income. Id. subsec. (b). In general, a method of accounting clearly reflects income when it results in accurately reported taxable income under a recognized method of accounting. RLC Indus. Co. & Subs. v. Commissioner, 98 T.C. 457, 490 (1992), aff'd, 58 F.3d 413 (9th Cir. 1995). "[N]o uniform method of accounting can be prescribed for all taxpayers." Sec. 1.446-1(a)(2), Income Tax

[*29] Regs. Ordinarily, a method of accounting will clearly reflect income when the taxpayer consistently uses a recognized method of accounting that comports with generally accepted accounting principles that are prevalent in the taxpayer's industry. See RLC Indus. Co. & Subs. v. Commissioner, 98 T.C. at 490; Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. 1029, 1045 (1982).

The Secretary has broad authority to determine whether the taxpayer's method of accounting clearly reflects income; and if he determines it does not, he has broad authority to choose the taxpayer's method. Thor Power Tool Co. v. Commissioner, 439 U.S. at 532; Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995); Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. at 1044-1045; Bay State Gas Co. v. Commissioner, 75 T.C. 410, 417 (1980), aff'd, 689 F.2d 1 (1st Cir. 1982). In that case "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Sec. 446(b). We review the Secretary's determinations for abuse of discretion. Commissioner v. Hansen, 360 U.S. 446, 467 (1959); RECO Indus., Inc. v. Commissioner, 83 T.C. 912, 920 (1984).

A.    Cash or Accrual Method

Before we can address the clear reflection question, we must determine what method of accounting JFLP uses and what method respondent chose for it.

[*30] Petitioners argue that JFLP is a cash method taxpayer and respondent did not timely exercise his authority to change JFLP's overall method of accounting to the accrual method. They argue that the assertion of the accrual method is a new matter raised for the first time in respondent's briefs. They argue that we should preclude respondent from raising the change to the overall accrual method on the basis of fairness and surprise. We agree.

On its partnership returns JFLP checked the box indicating that it was a cash method taxpayer, and it reported cash payments when they were received and deducted expenses when they were paid. JFLP improperly used the installment method to report its income from the mobile home sales. It did not report the sales using the cash method, and the method it regularly and consistently used is not permissible. When a taxpayer has not regularly and consistently used a method of accounting, the Commissioner has authority to choose the taxpayer's method of accounting. Sec. 446(b). However, we find that respondent did not timely exercise his authority to change JFLP's method from the cash method to the accrual method.

Respondent challenges JFLP's use of the cash method. He contends that JFLP's QuickBooks work papers are labeled "accrual basis", JFLP accounted for inventories, and JFLP deducted accrued expenses. The record does not support

[*31] the latter two allegations. However, that is not respondent's only problem. In the FPAA respondent did not assert that JFLP's cash method did not clearly reflect income. Nor did he assert that position in the amendment to the answer. Rather, respondent asserted that JFLP was not eligible to report its sales under the installment method. Our inquiry, as the parties set it forth in the FPAA and the pleadings, is whether JFLP is entitled to use the installment method; that inquiry does not require an analysis of the clear reflection of income or respondent's exercise of his section 446 authority. Rather, we consider JFLP's eligibility under the requirements of section 453.

Respondent raised the change to the accrual method for the first time in his posttrial briefs. In the FPAA respondent asserted that JFLP must report income in the year of a mobile home sale using the face values of the notes as the amount realized. Likewise, respondent computed the section 481 adjustment on the notes' face values. These computations are consistent with both the cash and accrual methods of accounting and thus do not support a finding that respondent timely raised his section 446 authority to change JFLP's method of accounting. See Raymond v. Commissioner, T.C. Memo. 2001-96 (holding that the amounts realized by a cash method taxpayer were the face values of the notes received because the taxpayer did not present sufficient evidence to establish that their fair

[*32] market values were less than their face values). We further note that in his briefs respondent did not address the application of the accrual method's all events test to the notes. He did argue that the sales were completed under the burdens and benefits of ownership test, which is a separate issue that does not adequately address the all events test. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981).

In the amendment to the petition, petitioners assert that JFLP was a cash method taxpayer, which respondent denies without any further explanation or assertions. In his pretrial memorandum respondent does not identify JFLP's overall method of accounting as an issue for trial or assert that he exercised his section 446 authority to change JFLP's overall method of accounting. In the memorandum respondent stated that he had discretion to change JFLP's accounting of a specific item to deny the use of the installment method for JFLP's sales: "The Commissioner has determined that the petitioners are dealers and are not entitled to use the installment method of accounting for the sale income * * * and all income must be recognized in the year of the sale" as required by section 1001. Finally, at trial respondent's counsel stated that JFLP was a cash basis taxpayer. Respondent characterizes petitioners' arguments relating to the cash method as a retroactive change in JFLP's method of accounting that requires his

[*33] consent and therefore is not permitted. See sec. 446(e). However, petitioners are not arguing for a retroactive change. JFLP made that assertion on its partnership returns. Respondent has not timely challenged that declaration.

We find that respondent did not timely raise a change in JFLP's accounting method from the cash to the accrual method or timely exercise his section 446 authority to change JFLP's method of accounting. A taxpayer's entitlement to use the section 453 installment method does not depend on whether the method clearly reflects income. In the FPAA respondent did not challenge JFLP's use of the overall cash method or assert the cash method did not clearly reflect JFLP's income. Nor did he assert his authority to change JFLP's overall method of accounting from the cash method to the accrual method. Petitioners are unfairly surprised and prejudiced by respondent's new position on brief to require JFLP to change to the accrual method of accounting. See Dirico v. Commissioner, 139 T.C. 396, 415-417 (2012); Ware v. Commissioner, 92 T.C. 1267, 1269 (1989), aff'd, 906 F.2d 62 (2d Cir. 1990). Accordingly, we find that respondent cannot now assert his authority under section 446 to change JFLP to the accrual method. JFLP may report the mobile home sales under its overall cash method of accounting.

**[*34]** B.     Cash Equivalence

Under section 1001(a), JFLP has gain from a mobile home sale equal to the excess of the amount realized on the sale over its adjusted basis in the mobile home sold.  The amount realized is the sum of money received plus the fair market value of property (other than money) received.  Id. subsec. (b).  A promissory note is property other than money for purposes of section 1001(b).  McShain v. Commissioner, 71 T.C. 998, 1004 (1979).  Accordingly, we must determine the fair market values of the notes, if possible.  Petitioners argue that for cash method taxpayers a note is included in income upon receipt only if the note is the equivalent of cash, citing Cowden v. Commissioner, 289 F.2d 20 (5th Cir. 1961), rev'g and remanding 32 T.C. 853 (1959), Warren Jones Co. v. Commissioner, 60 T.C. 663 (1973), rev'd, 524 F.2d 788 (9th Cir. 1975),[7] and Felt v. Commissioner,

---

[7]In Warren Jones Co. v. Commissioner, 60 T.C. 663 (1975), the Tax Court adopted the cash equivalency doctrine as set forth in Cowden v. Commissioner, 289 F.2d 20 (5th Cir. 1961), rev'g and remanding 32 T.C. 853 (1959), and held that the debt obligation was not income because it was not a cash equivalent.  The Court of Appeals for the Ninth Circuit reversed and held that if a debt obligation has an ascertainable fair market value, the amount realized includes that value, without separately asking whether the note is a cash equivalent.  Warren Jones Co. v. Commissioner, 524 F.2d 788, 791-795 (9th Cir. 1975).  We find infra pp. 39-42 that the notes at issue did not have ascertainable fair market values and thus would not be included in the amounts realized under either doctrine.  See McShain v. Commissioner, 71 T.C. 998, 1004-1005 (1979) (declining to express an opinion on the issues presented in Warren Jones).

**[\*35]** T.C. Memo. 2009-245, aff'd, 433 F. App'x 293 (5th Cir. 2011).  They argue that the notes are not cash equivalents and JFLP did not have any gain upon receipt of the notes.

When a cash method seller receives a debt instrument that entitles it to a future income stream, we have traditionally evaluated the debt instrument for its "cash equivalence" when the seller is not using the installment method to report payments upon the instrument.  See Griffith v. Commissioner, 73 T.C. 933, 937 (1980); Watson v. Commissioner, 69 T.C. 544, 549-552 (1978), aff'd, 613 F.2d 594 (5th Cir. 1980); W. Oaks Bldg. Corp. v. Commissioner, 49 T.C. 365, 376 (1968); Ennis v. Commissioner, 17 T.C. 465, 470 (1951).  Under the cash equivalency doctrine, we consider whether a debt obligation is a "promise to pay of a solvent obligor and the obligation is unconditional and assignable, not subject to set-offs, and is of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money".  Cowden v. Commissioner, 289 F.2d at 24;[8] see Watson v.

---

[8]In Cowden v. Commissioner, 289 F.2d at 24-25, the Court of Appeals for the Fifth Circuit held that the Tax Court had improperly held that the amount realized was the full contract price on the basis that the other party to the contract was willing to pay the full price so the taxpayer could have received the entire payment in the year the contract was executed.  The Court of Appeals held that the amount realized includes a debt obligation that is a cash equivalent to the extent of

(continued...)

**[\*36]** <u>Commissioner</u>, 69 T.C. at 551-552.  A note is a cash equivalent if the holder of the note can sell it for an immediate cash value even if that cash value is less than the note's face value.  <u>Felt v. Commissioner</u>, slip op. at 14.

Petitioners have the burden to prove that the notes are not cash equivalents. We have held that a taxpayer can meet its burden of proof by showing "that the debtors were insolvent, the notes could not be assigned, or the notes would have traded at a deep discount."  <u>Id.</u>, slip op. at 15 (citing <u>Cowden v. Commissioner</u>, 289 F.2d at 24).  In <u>Felt v. Commissioner</u>, slip op. at 10-12, we held that the note of an insolvent debtor was worthless at the time it was received and its receipt did not result in taxable income for the cash method taxpayers.  We find that petitioners have met their burden.  The notes are not cash equivalents.

Most buyers were low income, had poor credit and unstable job histories, and could not obtain traditional bank loans to purchase homes.  While these facts may not establish that the buyers were insolvent, it is clear that JFLP could not have sold the notes or, if it had, the sale would have been at a deep discount.  JFLP did not perform credit checks, making it difficult to determine the likelihood that any individual buyer would default or the length of time before he would default.

---

[8](...continued)
its fair market value irrespective of the amount the taxpayer could have received if he had made a different bargain.  <u>Id.</u> at 25.

[*37] The Joyners accepted the buyer's word that he had a job and did not verify the buyer's employment or the amount of his wages. Respondent argues that JFLP did perform credit checks. However, Mr. Joyner testified that he did not and explained his reasons for not doing so. We found him credible.

JFLP marketed the mobile homes to low-income individuals and assumed the risk of nonpayment. In turn, it charged higher than market interest rates and had high profit margins on the sales, suggesting that the sale prices significantly exceeded the values of the land and mobile homes sold. The notes did not state the number of payments required to pay the notes in full or the length of time it would take for the buyers to pay off the notes. The average term of the notes was 22 years. A number of buyers paid in full and received title to their homes. However, the majority of buyers during the years at issue defaulted within two years, and over 92% defaulted within six years. Respondent challenges the 92% default rate, but we find petitioners' witnesses credible.[9] We find that his allowance of the worthless debt deductions in the FPAA is an admission of the high default rate. His assertion in the amendment to the answer that JFLP is not

---

[9]We find purported discrepancies in JFLP's records between repossession dates and the dates of last payments immaterial. Mr. Joyner credibly testified he allowed multiple missed payments, and Ms. Joyner credibly testified that she accurately reported all sales and repossessions.

[*38] entitled to the worthless debt deductions on the basis of section 1038, which disallows such deductions on the repossession of property in satisfaction of the debt secured by the property, is not related to the values of the notes or the high default rate.

JFLP's business practices further affected the marketability of the notes. Usually the Joyners would allow buyers to miss multiple payments before they asked the buyers to vacate the property and at times allowed extended periods of missed payments if the buyers were in financial distress because of medical reasons, lost jobs, or other issues. They believed in giving people a chance. When a buyer defaulted, JFLP never tried to collect the unpaid balance after the default, and it is unlikely that it could have done so given the typical buyer's financial situation. JFLP simply retook possession of the mobile home and offered it for sale or rent. There was no expectation by the buyers that they were indebted to JFLP for the full sale prices despite signing the notes. The buyers understood that the notes would not be enforced. For the most part, the Joyners did not expect the buyers to pay the notes in full, and the buyers understood the notes would not be enforced if they vacated. For JFLP's typical buyer there was no reasonable expectation of full payment. See Litton Bus. Sys., Inc. v. Commissioner, 61 T.C.

[*39] 367, 377 (1973) (stating that a genuine debt includes a reasonable expectation of repayment).

Other of JFLP's business practices also negatively affected the notes' marketability. JFLP also allowed buyers to convert their sales to rentals, which effectively nullified the notes. It even allowed buyers to convert to rentals after they had already defaulted on their notes. In addition, JFLP had outstanding mortgages on its land and sold lots subject to the mortgages, which would have severely affected its ability to market the notes.

Petitioners also presented credible and helpful expert testimony on the notes' lack of marketability. We agree with petitioners' experts. There was no market for JFLP to sell the notes. We find that it is highly unlikely that JFLP could have sold the notes and any sale would have been at a deep discount. See Estate of Wiggins v. Commissioner, 72 T.C. 701 (1979) (finding buyers' payment obligations were unmarketable and applying the open transaction doctrine where the seller did not perform credit checks and buyers defaulted a rate of 40%). The notes were not the equivalent of cash.

C.    Fair Market Value

As we have found that the notes are not the equivalent of cash, JFLP is not required to report income for the years it received the notes. We have found that

[*40] there was not a market for the notes. Nevertheless, we briefly address the parties' arguments regarding the notes' fair market values. Fair market value is the price at which a willing buyer and willing seller would exchange property when neither party is acting under a compulsion to buy or sell and both parties have reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). Fair market value is a question of fact, and "only in rare and extraordinary cases will property be considered to have no fair market value." Sec. 1.1001-1(a), Income Tax Regs. Courts will find fair market value ascertainable unless the "total amount payable under an obligation * * * [is] so speculative, or the right to receive any payments at all [is] so contingent, that the fair market value * * * cannot be fixed." Warren Jones Co. v. Commissioner, 524 F.2d at 794. "[T]he solvency of the maker of a note is of prime importance in determining whether it is worth its face value." Tietig v. Commissioner, T.C. Memo. 2001-190, slip op. at 21, aff'd, 57 F. App'x 414 (11th Cir. 2003).

Petitioners presented expert testimony on the notes' fair market values; respondent did not. Rather, respondent asserts that the notes are worth their face values; they clearly are not. He presented expert testimony of the fair market value of the land and argues that we can determine the fair market values of the mobile homes using a simple equation of the sale prices less the land values. He

**[*41]** argues that the notes have the same values as the land and mobile homes sold. See United States v. Davis, 370 U.S. 65 (1962) (holding that the value of property received in exchange can be inferred from the value of the property given up). We do not agree. When we consider the prices that JFLP paid for the used mobile homes, it is clear that JFLP set above-market sale prices for them as part of the seller-financing arrangements. JFLP's gross profit margins on the sales were between 50% and 60%; some sales had gross profit margins as high as 80%. Respondent's method of valuation is not persuasive especially in the light of the buyers' financial situations. We find respondent's method of valuation is not supported by the record.

Finally, we address respondent's challenges to the reliability of petitioners' experts. He argues that petitioners' experts based their opinions on inadequate and irrelevant information and they lacked experience in the valuation of land, mobile homes, and seller-financed transactions. He further argues that Mr. West improperly relied on assistants in the preparation of his report. Respondent also argues that he was prejudiced because petitioners did not produce the documents that the experts used to prepare their reports. We find that petitioners produced sufficient documentation to support their experts' testimonies, and respondent was not prejudiced by their testimonies. Both of petitioners' experts were knowl-

**[*42]** edgeable, and their testimonies were reliable. Mr. West's use of assistants did not make his testimony unreliable under the circumstances of this case.

We find Mr. Harkins' and Mr. West's testimonies helpful and convincing. We agree that issues with the terms, the executions, and the enforcement of the notes and agreements rendered the notes unmarketable. The notes executed during the years at issue had extremely high default rates. JFLP marketed the mobile homes to low-income individuals, did not perform credit checks, and knew that the buyers could not obtain bank loans to finance the purchases of homes. We find petitioners' evidence credible and persuasive including the facts and circumstances relating to the buyer's financial situation, the lack of a market for the notes, JFLP's business practices, the high default rate, and petitioners' experts' testimony. We find respondent's challenges to these facts lack support in the record and are without merit. Respondent did not present evidence of the notes' fair market values and merely continued to advance the face value argument. He is held to that choice. We hold that the notes had no value when executed.

D.    Unreported Sales or Gross Receipts

Respondent argues that JFLP's books and records contained numerous errors and JFLP failed to report all gross receipts. He spends a considerable amount of time in his briefs citing purported evidence of unreported sales and

[*43] payments. He argues that JFLP did not report all sales, failed to report monthly payments and downpayments, reported sales as occurring in the wrong year, changed the names of buyers to conceal sales, and did not report cash payments from buyers. He identifies concerns with the reporting of specific sales. He does not seek to increase JFLP's gross receipts for the years at issue on the basis of this alleged underreporting. Instead, he argues that these alleged omissions give him authority to change JFLP's method of accounting to the accrual method. He argues that if there is an omission or other error in a taxpayer's reporting, the taxpayer's method of accounting does not clearly reflect income and he may reconstruct the taxpayer's income using any reasonable method, citing caselaw involving the bank deposit analysis.

As with respondent's attempt to change JFLP to the accrual method, the unreported gross receipts issue is not properly before the Court. Nevertheless, we find that JFLP did not omit any gross receipts from its partnership returns as respondent alleges. Ms. Joyner credibly testified that she recorded all sales and payments received in the books and records and JFLP reported all gross receipts on its partnership returns. We find her honest and forthright in her testimony. The purported discrepancies in JFLP's workpapers and records identified by respondent are immaterial as we do not find any alleged discrepancies that resulted

[*44] in an underreporting of sales or gross receipts. We find that JFLP reported the payments it actually received. Any inadequacies in JFLP's books and records did not result in underreported income.

E.    Substantiation of Basis

Respondent also argues that JFLP's books and records do not adequately substantiate its bases in repossessed mobile homes and JFLP improperly recouped bases multiple times because it did not reduce bases for the portions of the buyers' payments allocated to basis recovery. We find that JFLP did in fact adequately account for basis recovery. The unrecovered basis for a repossessed mobile home is the difference between the unpaid principal balance of the note and the gross deferred income at the time of the repossession. The recovered basis is easily computed by subtracting the unrecovered basis from the original cost basis. JFLP reported its previous basis recovery as "gain on repossession" for each year at issue, and we find its computations accurate. Respondent's arguments to the contrary are unfounded.

Furthermore, there are obvious explanations for the basis discrepancies that respondent cites. He identifies several instances where JFLP increased its basis in a repossessed home on its resale. JFLP often made improvements to a repossessed mobile home before its resale, allowing it to increase its basis. Mr. Joyner

[*45] credibly testified that repossessed mobile homes were often in poor condition and required repairs to make them livable. Respondent also argues that some buyers made improvements to their mobile homes that increased their values and that JFLP did not account for the buyers' improvements on the repossessions.[10] He cites a mobile home sold in October 2010 for $70,000, arguing that the buyer made substantial improvements that increased the home's value and then swapped it for another mobile home in early 2011. JFLP resold the home for the same $70,000 price in July 2011 despite these allegedly substantial improvements. Respondent's arguments are without merit.

Respondent also argues that JFLP failed to maintain adequate records of the mobile homes it repossessed and its bases in the repossessed mobile homes. He argues that the inadequacy of JFLP's records entitles him to change JFLP to the accrual method. We have already held that respondent did not timely raise the change in JFLP's overall method of accounting. Furthermore, we find that petitioners have established the number of repossessions with adequate records and credible, persuasive testimony. In the FPAA respondent accepted JFLP's

---

[10]Respondent argues that JFLP did not keep adequate records of the buyers' improvements to repossessed properties and did not obtain appraisals of the improvements or maintain adequate records of its bases in the repossessed properties adjusted for the improvements. He did not properly raise these arguments in his pleadings or otherwise.

[*46] books and records as accurate and allowed JFLP to deduct as worthless debt the unpaid note balances for the repossessed homes. He did not challenge the accuracy of JFLP's records. Respondent thereafter raised the substantiation issue. We held before trial that respondent has the burden of proof on issues raised in the amendment to the answer. He has not met his burden.

III.     Clear Reflection of Income

The final issue presented by the parties is whether JFLP's method of accounting and the method of accounting chosen by respondent clearly reflect income. As stated supra pp. 28-29, the taxpayer's chosen method must clearly reflect its income; and if the Secretary determines that it does not, the Secretary has broad authority to choose a method that in his opinion does clearly reflect the taxpayer's income. Sec. 446(b). However, we have held that respondent did not timely exercise his authority to change JFLP from the overall cash method to the accrual method. Rather, respondent timely asserted that JFLP cannot use the installment method. That argument does not involve an examination of the clear reflection of income. Respondent did not determine that JFLP's chosen overall cash method did not clearly reflect income. Nor did he timely choose a different method of accounting for JFLP. Respondent has made no timely determination under section 446, and thus there is no method chosen by respondent for us to

**[\*47]** consider.[11]  Accordingly, we will not consider whether JFLP's overall cash method clearly reflects its income and will allow JFLP to use the overall cash method to report its mobile home sales during the years at issue and for purposes of the section 481 adjustment.

To the extent that respondent argues that his valuations of the notes are entitled to review for abuse of discretion, we disagree.  Valuation is a question of fact and relates to the amount realized on JFLP's receipt of a note.  See sec. 1.1001-1(a), Income Tax Regs.  It is not an accounting method choice.  Furthermore, respondent's use of the notes' face values is clearly improper.  Respondent made no effort to determine the notes' fair market values in this case.  Respondent's valuation of the notes at their face values is arbitrary and without

[11]As we find that JFLP is not required to report the face values of the notes upon receipt, we do not need to address whether JFLP is entitled to a worthless debt deduction upon a default.  We note that respondent's arguments with respect to the worthless debt deductions are problematic.  For example, he failed to consider the sec. 1038 basis adjustment rules that would allow JFLP a stepped-up basis upon the resale of a repossessed mobile home.  JFLP resold one mobile home three times, in 2009, 2010, and 2011.  Respondent computed the gain on the 2010 and 2011 sales without the sec. 1038 basis adjustments.  Petitioners identify at least nine properties subject to this distortion.  Further, respondent makes the nonsensical argument that JFLP should be taxed on the notes' face values but denied a worthless debt deduction because petitioners have not established the notes had value when executed, a requirement for a worthless debt deduction.  See Sensenig v. Commissioner, T.C. Memo. 2017-1, at \*17-\*18, aff'd, 720 F. App'x 139 (3d Cir. 2018).

**[\*48]** basis in fact or law. Accordingly, respondent's valuation method would fail the abuse of discretion standard.

IV.  Conclusion

Petitioners have met their burden of proving that the notes are not cash equivalents and there was no market for them. They have further met their burden of proving that the notes had no ascertainable value. Respondent chose not to provide evidence on the notes' fair market values to counter petitioners' persuasive evidence, instead relying on the notes' face values. Although JFLP improperly reported the mobile home sales under the section 453 installment method, we hold that on the basis of the record JFLP is entitled to report its mobile home sales using the overall cash method of accounting. We further hold that JFLP did not have gain upon receipt of the notes as the notes had no value. Accordingly, JFLP may report income from the mobile home sales as of when it received the payments on the notes. See Golden Gate Litho v. Commissioner, T.C. Memo. 1998-184, slip op. at 28 (holding that when the Commissioner has abused his discretion "the Court may choose to let * * * [the taxpayer's improper method] stand"). Likewise, we hold that any section 481 adjustments are determined on the basis that JFLP may report its sales on the cash method and it had no gain upon receipt of the notes. We further hold that JFLP reported all sales

**[*49]** and reported all payments that it received, having found Ms. Joyner credible in her testimony to these facts.

Key principles underlying methods of accounting are that the taxpayer's lifetime income does not change irrespective of the taxpayer's method of accounting and tax corresponds to the taxpayer's ability to pay. Respondent's adjustments would result in a substantial amount of income for JFLP, more than $8 million, far in excess of its actual cash receipts. Clearly, JFLP did not generate sufficient receipts during the years at issue to pay the $8 million of tax asserted as due. Nor could it sell the notes.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit. In the light of our decision that JFLP is not entitled to report the mobile home sales under section 453,

Decision will be entered under
Rule 155.